The B. F. GOODRICH COMPANY,
Plaintiff,

v.

UNITED STATES RUBBER COM-
PANY, Defendant.
Civ. No. 7501.

United States District Court
D. Maryland.
Dec. 12, 1956.

Fish, Richardson & Neave, Stephen H. Philbin, William K. Kerr, New York City, Semmes, Bowen & Semmes, Lawrence Perin, Baltimore, Md., for plaintiff.

Kenyon & Kenyon, Theodore S. Kenyon, Malvin R. Mandelbaum, Arthur, Dry & Dole, Paul H. Arthur, Frederick W. Wood, New York City, Venable, Baetjer & Howard, H. Vernon Eney, Baltimore, Md., for defendant.

R. DORSEY WATKINS, District Judge.

This is an action for alleged infringement by defendant of plaintiff's [1] patent No. 2,587,470, issued February 26, 1952, on an application filed in the Patent Office on December 14, 1946. For convenience, the patent in suit will sometimes be referred to as the Herzegh patent.

The answer denied infringement and set up the usual [2] defenses of prior knowl-

---

1. Application was filed by Frank Herzegh, Senior Research Engineer in plaintiff's Tire Construction and Design Department of its Tire Equipment Division, and was assigned to plaintiff. The head of plaintiff's patent department appears as attorney on the application.

2. The answer also contained the stock defenses (a) that Herzegh did not himself

edge and use; disclosures in printed publications more than one year prior to the application date; lack of novelty; and that the claims are directed to an aggregation of old and well-known elements, obvious to a person having the ordinary skill of the art.

Jurisdiction under the patent laws, including sale and use by defendant within the District of Maryland of products allegedly embodying the invention of the Herzegh patent, and maintenance by defendant of a regular and established place of business within the District, was asserted and proved. 28 U.S.C. § 1338; 28 U.S.C. § 1400(b).

A brief description [3] of a typical tire is necessary to an understanding of the state of the art at the time of plaintiff's alleged invention, and the improvements claimed in the Herzegh patent.

A conventional tire assembly pertinent to this suit consists of a tire casing (usually called simply a tire), together with an inner-tube, and a one-piece metal rim.

The tire has a tread or wearing surface and a sidewall covering the outer part of the tire to protect the body of the tire, on a carcass containing plies, cords and beads.

The tread runs on the road, and may be either integral with the sidewall covers or a separate part adjoining the sidewall covers. Usually, the tread and sidewall covers are composed wholly or mostly of natural rubber or of butadiene-styrene synthetic rubber (until recently known as GR–S). Both of these are more abrasive resisting than butyl rubber.

GR–S rubber is a synthetic rubber very like natural rubber, with which it is compatible, so that they can be blended or adhered one to another. Butyl rubber is also synthetic, but less abrasive resistant than either natural or GR–S rubber, and is incompatible with them. Butyl rubber also has a higher "permanent set" and less resiliency than natural rubber or GR–S; that is, it tends to remain in the shape in which it may have been deformed or distorted, rather than returning to its previous shape. Butyl is, however, only about one-tenth as permeable by air as natural rubber.

The carcass is composed of plies (sheets of cord fabric, coated with rubber) containing cords. There are usually four, but sometimes six, plies in passenger car tires. Each ply is a layer of parallel cords coated and surrounded by rubber. The cords are strong, flexible threads, which may be made of cotton, nylon, or other fabric, or wire, but at present are usually rayon. The plies lie on top of each other, the innermost ply being inside the carcass, and the outermost ply is on the outside of the carcass just under the tread. They are numbered in that order, the innermost being referred to as the first ply. The cords in adjacent plies cross the center line of the tire at the same angle, but in opposite directions.

The beads contain bundles of wires, bound together and placed in the margins of the sidewalls, which rest against the flanges of the metal wheel rim. The wire beads form a non-extensible anchorage for the plies, which are anchored by wrapping them around, or partially around, the bead. This is known as a "ply lock". In the "conventional" ply lock, plies 1 and 2 come underneath the bead on the inner side of the tire and then turn up around it on the outside. Ply 3 comes down the outer side of the tire, turns under the bead and up on the inner side a short distance. Ply 4 fol-

invent the subject matter sought to be patented, a defense which was not pressed; and (b) that the claims of the patent fail "to particularly point out and distinctly claim the subject matter of the alleged invention" and "are without sup-

port in the specification of the patent as issued."

3. The court has drawn heavily on the descriptions contained in plaintiff's trial brief, and brief after close of testimony.

lows the same course, except that it terminates under the bead.

The bead portion of the tire is the portion in which the beads are located. The bead toe is the sharp corner on the inside of the tire, and the bead heel is on the outside where the bead rests against the rim flange.

Terminology is not completely consistent. Thus the word "sidewall" is sometimes used to refer to the sidewall cover, which is actually the surface layer only of the sidewall. Similarly, the word "bead" is sometimes used to refer to the wire ring only, or to the wire, together with its wrappings, and the word "grommet" is sometimes used with the same meaning.

Sometimes a "chafer" or "finishing" or "rim seal" or "bead sealing" strip is placed between the beads and the rim flange to prevent the plies around the beads from being chafed or rubbed during operation.

The ordinary rim on passenger car tires is now, and for many years had been, of the one-piece drop-center straight-side flange type.

In the conventional commercial automobile tire produced before 1948, an inner tube was used. This, and not the carcass, was designed to be the air retaining member. But at least until the advent of the butyl rubber inner tube,[4] substantial loss of air occurred through the inner tube. As the rubber elements

of the tread and plies were generally of the same basic material as the inner tube and their combined thickness of rubber was greater than that of the inner tube, and as the permeability of rubber is directly proportional to its thickness, such air escaping from the inner tube would be trapped, unless some venting was provided. Trapped air would tend to diffuse into the plies, and cause the formation of blisters and the separation of the plies, resulting in early failure of the tire. It was therefore customary to provide grooves in the base of the beads, or ribs on the surface of the inner tube, all leading to the valve stem, to allow the escape of trapped air.

A satisfactory tubeless tire required a lining more nearly impermeable to air than the carcass of the tire, and an effective air seal between the tire beads and the rim.[5] Claim 19 was selected by plaintiff as typical of the claims in suit.[6] It reads as follows:

"19. A one-piece pneumatic tubeless tire comprising an open-bellied hollow annular body of arcuate cross section having a tread portion and outwardly bowed side walls terminating in spaced-apart bead portions adapted to seat on the flanges of an annular rim of straight-side flange construction, the arcuate extent of said body from bead portion to bead portion being such that upon inflation of said body with the bead

---

4. Butyl was released for use in passenger car inner tubes after January 1, 1946.

5. The conventional drop center rim, in use since at least 1925, is a single piece of metal, air-tight except for the aperture for the inflating valve. The patent contains no claim for the valve element.

6. Claims 11, 12, 13, 19 and 20 are in suit. Claims 11, 12 and 13 differ from 19 essentially only in the terminal points of the liner. In Claim 11 it is described as "terminating short of said ribs on the outer faces of said bead portions"; in Claim 12 it is "terminating at the outer faces of said bead portions at a position to leave said rubber material of the ribs exposed for sealing contact with the flanges of said rim"; and in Claim 13 it is "extending continuously from one bead

portion to the other and continuing around the toes of the bead portions and on to the radially innermost rim-contacting faces of the bead portions." Claim 20 differs as to point of termination and also in the description of the liner, Claim 20 covering "a lining of substantially impervious material extending over the inner face of the tire."

The ribs in Claims 11 and 19 are stated to be "of the same material as the side walls"; in Claim 12, "of said rubber material of the side walls"; and in Claims 13 and 20, "of resilient rubber material."

The bulk of the testimony and argument related to Claim 19, although Claim 20 will also require some separate consideration in this opinion.

portions seated on said rim flanges the maximum width of the body lies in a zone intermediate the bead and tread portions thereof and is substantially greater than the bead spacing, means for sealing the joints between the bead portions of said body and the flanges of said rim against the escape of air from within said body when the tire is inflated comprising a plurality of circumferentially continuous ribs molded integrally with said bead portions and extending outwardly from the axially outer face of said bead portions, said ribs being of the same material as the side walls of said body and being urged into sealing engagement with the rim flanges by the air pressure within said body when the tire is inflated and said ribs in their undistorted shape prior to being pressed against the rim flanges having an outwardly convex, approximately semi-circular cross-section, and a relatively thin lining of substantially impervious butyl type rubber composition adherent to and completely covering the inner surface of said body, said lining extending continuously from one bead portion to the other and terminating short of the outer surfaces of said ribs on said bead portions."

The attached exhibit-diagram of plaintiff's present [7] tubeless tire will be helpful to an understanding of the problems in this case.

**7.** As will be shown, many structural changes have been made by plaintiff since the first tires were produced under the Herzegh patent in 1948.

Plaintiff frankly admits that the Herzegh patent is not broadly for a tubeless tire and could not be, because of the many types of tubeless tires previously patented.

As stated by plaintiff's counsel:

"The invention of this claim [19] consists of a tire of ordinary body and sidewall construction on an ordinary wheel rim with flanges, which, when inflated with air, will operate satisfactorily, because of the *specific kind of sealing ribs* and the *specific kind of liner* described in the claims." [8]

Again:

" * * * There is no doubt that each feature in the Herzegh combination was known to the art. However, it is clear that the *specific arrangement and placement in combination*, which he taught and embraced in his claims and which the proof will show has solved factually the obviously difficult problem that confronted tire manufacturers, had never been suggested. Herzegh demonstrated that his *specific placement and prescribed relationship* of conventional tire, conventional rim, impervious liner and sealing ribs furnished a complete answer to the problem. This produced a new and useful result which had not been previously accomplished." [9]

It is therefore unfortunately necessary [10] to consider in some detail just what are the "specific kind of sealing ribs"; the "specific kind of liner"; and the "specific arrangement and placement in combination" which Herzegh taught.

An object of the invention is "to provide a high resistance to diffusion of air into and through the wall of the tire; and to provide this high degree of impermeability" without objectionable heat.[11]

A further object of the invention is "to provide for sealing * * * between the tire bead portions and the rim flanges * * *." [12]

The specifications describe the sealing means as follows: [13]

"Provision is made for sealing the tires at the straight-side rim flanges 12. The axial outer face of the bead portion is formed with a plurality of ribs 24, 24 extending in a circumferentially continuous manner about the tire. These ribs are of resilient rubber or other rubber-like material and preferably are molded integrally with the bead portion of the tire wall. The ribs are urged in the axially outward direction against the rim flange by the inflation pressure within the tire and effect a seal not only against the leakage of air from within the tire past the bead portion, but also a seal against the entrance of water, soil or other foreign matter from without, and the sealing in this manner is advantageous further in being maintained effectively even under conditions of rocking of the bead portions under extreme deflections of the tire. Further, I have found that it is possible to insert tire tools between the rim and the bead portions for assisting in demounting the tire without injury to the ribs, the heel of the bead portion taking the prying action of the tool.

"It is preferred that each rib be of a height in the axial direction of the tire not greater than the thickness of the rib in the direction radially of the tire, so that the rib will maintain stability as it is pressed against the rim flange without twisting out of shape or tilting over ob-

---

8. Plaintiff's trial brief, p. 7. (Emphasis supplied throughout the opinion both in text and footnotes, unless otherwise noted.)

9. Plaintiff's trial brief, pp. 9–10.

10. Both from the standpoint of validity and infringement.

11. Patent, Col. 2, ls. 38–45.

12. Col. 2, ls. 29, 31–32.

13. Col. 3, *l.* 49 to Col. 1, *l.* 24.

jectionably, and will form an effective seal continuously around the tire. Good results have been obtained with a shape of the rib generally semi-circular in cross-section as shown, providing rounded rim engaging faces. The ribs 24, 24 are spaced-apart radially of the tire to permit distortion of the material of the rib into the zones between the ribs, thereby increasing the ability of the rib to conform to the face of the rim flange for effective sealing despite irregularities that may be present in the flange surface. The provision of spaces between the ribs has the further advantage of providing labyrinth chambers in the event of any slight leakage that may occur past one or more ribs so that the total pressure drop from within the tire to outside is divided into a plurality of small drops of pressure, which arrangement has the advantage of greatly reducing the rate of leakage. In practice I have found that the construction above described maintains a tight seal indefinitely."

It should be noted that the only statement as to the material of the ribs is that they are "of resilient rubber or other rubber-like material." This does not in terms exclude the use of butyl for the ribs, for butyl-type rubber, prescribed for the liner in all claims in suit except Claim 20, is described as exhibiting good properties of "flexibility and resilience." Butyl is admittedly a "rubber-like material."

The liner material is described as follows:[14]

"The butyl type of synthetic rubbers, which are copolymers of isobutylene and a diolefine such as butadiene or isoprene, are found to be well suited for the purpose of this lining layer 25. The lining layer of such butyl type rubber at the inner face of the tire and adhered to the rubber of the tire wall so as to constitute an integral part of the wall is found to render the walls highly impervious to the air under pressure directly against it, so that diffusion into the wall such as would be likely to cause blisters and ply separation is effectively prevented. At the same time such butyl type rubber exhibits good properties of flexibility and resilience and gives good results even when the layer is relatively thin, so that this lining layer together with the fabric reinforced rubber composition normally used in the tire body are as a composite unit well able to withstand rapid cyclic flexing stresses in use.

"As an example, intended as being illustrative rather than wholly limiting, the following butyl type rubber composition, in a thickness of the lining layer 25 of the order of .04 inch and even lower, depending on the type of service, has given excellent results for the purposes of this invention in extensive tire tests:"

This single example, in which the only rubber component is butyl rubber, embodies the recipe used in regular production of plaintiff's butyl inner tubes since at least as early as December, 1945. The liner thickness of .04 inch compares with the .044 thickness of an inflated inner tube.

The extent and termination of the liner, stressed as a crucial part of the invention, is stated in the specifications as follows:[15]

"The lining layer 25 preferably is extended down to the bead portions, around the toe 26 of the bead portion and to the heel 27."

The drawings show, and plaintiff's commercial production for the first year embodied, a liner completely covering the inner surface of the tire body from toe to toe and also the inner (or radially innermost) surface of the bead, i. e., the base of the bead, from toe to heel. That is, the butyl type rubber liner extends

14. Col. 4, *l.* 53 to Col. 5, *l.* 3.

15. Col. 4, ls. 48–52.

along the base of the bead, in engagement with the rim base from the bead toe to the bead heel. The rim-flange engaging surface of the bead in such case has no butyl liner protection, although it is subject to full inflation pressure of the air at all points below the lowermost rib. This disclosure therefore did not suggest means for preventing the escape of air into the body of the tire between the outer edge of the butyl lining at the heel, and the first or lowermost rib. In this area the ply cords are closest to the surface and most likely to be exposed, especially as some displacement and flow of rubber is likely to occur during vulcanization. A ply cord exposed to air under inflation pressure would act as an "air wick" and probably result in blisters and ply separation.

In summary, the specifications teach, and Claim 19 of the Herzegh patent claims, as to the two alleged novel elements and their relationship, as follows:

1. Sealing ribs.

The specification discloses ribs of "resilient rubber or other rubber-like material" for sealing "against the leakage of air from within the tire past the bead portion" and against the entrance of foreign matter from without.

Claim 19 specifies the ribs as "between the bead portions" of the tire body and the "flanges" of the rim.

Claim 19 also says that the ribs are "of the same material as the sidewalls of" the tire body.

2. Liner.

The Herzegh patent teaches that the rubber tire wall should have a lining layer "of suitable flexible, durable and relatively impermeable material to prevent excessive diffusion into and through" the tire wall. The patent then states that butyl type rubbers "are found to be well suited for the purpose of this lining layer", and a single example of a butyl type rubber composition [16] is given, which is the same as plaintiff's butyl inner tubes.

Claim 19 is for a "relatively thin lining of substantially impervious [17] butyl type rubber composition adherent to" the body.

The patent teaches a liner "preferably extended down to the bead portions, around the toe * * * of the bead portion and to the heel * * *."

Claim 19 describes the liner as "completely covering the inner surface" of the tire body and "extending continuously from one bead portion to the other and terminating short of the outer surfaces of" the "ribs on said bead portions."

In place of a butyl inner tube in a tire carcass vented to the outside air, the Herzegh patent in effect has used one-half a butyl inner tube to line the entire inside of the carcass and extending to the bead heel; has used the drop center rim for the other half of the air container (sealing the valve stem in the rim); and has molded ribs into the side walls in the

16. In the formula, to the butyl rubber were added various compounding ingredients, such as iron oxide, resin, mineral oil, sulphur and accelerators, forming a "compound" or "composition". The particular formula or recipe would be referred to as a "butyl type rubber composition", to distinguish it from other compounds where a different synthetic rubber was the sole rubber in the compound. This is because there are, or may be, a number of types of a particular synthetic rubber.

17. The specification disclosure of a liner of "relatively impermeable material" does not state to what the impermeability is relative. The claim for a "lining of substantially impervious butyl type rubber composition" is susceptible of the interpretation that it means (a) that of the various possible butyl type rubber compositions, that one which is substantially impervious is claimed; or (b) that in the terms of absolute impermeability, out of the whole field of possible choices, a substantially impervious butyl type rubber composition alone is claimed.

This unfortunate ambiguity in the specifications and Claim 19 should be borne in mind in considering anticipation, novelty and infringement; and also in connection with the broad language of Claim 20 for "a lining of substantially impervious material."

area where such side walls engage the rim flanges.

### Questions Presented.

Has this device been anticipated by the prior art; is it a novel combination of old and well-known elements, or an aggregation thereof; and if validly patented, has it been infringed by defendant?

### Prior Art—Patents and Work on Tubeless Tires.

Plaintiff offered in evidence a book of sixty-six patents granted during the period 1903–1949, most of which relate to pneumatic tires without inner tubes. In considering these, and also the work whether by plaintiff, defendant, or others, on tubeless tires prior to the Herzegh application (December 14, 1946), two most significant facts must be borne in mind. First, the present drop-center straight-side flanged rim did not come into general use until 1925. The rims in use before that time, whether of the "clencher" type, or the myriad of other types of rims, often were of split construction, and did not purport (or need) to be air tight. Therefore some of the inventions were concerned primarily, or as a necessary incident, with the sealing of the rim elements to each other.[18] Second, butyl rubber, a synthetic material having physical properties of elasticity and plasticity resembling those of natural rubber, manufactured by copolymerizing isobutylene with a diolefin, although developed by a subsidiary of Standard Oil Company of New Jersey in the late 1930's, was during the war years in short supply and under Government control. It was not until 1946 that restrictions on the use of butyl rubber for civilian purposes

were lifted. Early in 1942 experimental quantities of butyl rubber were made available to the tire industry in the United States. Shortly thereafter inner tubes of butyl were manufactured and tested, which included tests by the United States Bureau of Standards. The reports of such tests, showing that butyl inner tubes were far less permeable to air than "rubber" inner tubes, were circulated to the plaintiff and other rubber companies in the spring of 1942.[19] By 1944, large numbers of inner tubes were made of compositions in which butyl rubber was the sole rubber constituent. Therefore, while the early patents on tubeless tires called for a "liner" in the carcass, such liners were of the only compositions then available—natural rubber, with or without fabric or other strengtheners. These would "work" insofar as the prevention of diffusion of air into the plies is concerned. The thickness of the rubber liner (which would have to exceed that of the tread) would have made such tires[20] expensive and heavy, would have impaired their flexibility and resilience, and would have led to overheating in operation.

This book of patents offered by plaintiff does show, however, that the questions of a liner and of a seal had been considered by many workers in the field of pneumatic tires, and embodied in many of the old patents.

Of significance on the need for liners (and in many instances seals) are:

Seddon—No. 747,001, application March 17, 1903, patented December 15, 1903. A pneumatic tire of canvas cemented inside and outside with rubber.

---

18. Sankey—No. 803,510. Application January 24, 1905, patented October 13, 1905.

Hartman—No. 927,793. Application February 28, 1908, patented July 13, 1909.

Rey—No. 1,333,678. Application May 29, 1918, patented March 16, 1920.

Case—No. 1,991,594. Application October 9, 1931, patented February 19, 1935.

Dickinson—No. 2,040,645. Application July 27, 1934, patented May 12, 1936.

19. Herzegh was advised by an inter-office memorandum dated December 18, 1942, that butyl was about equal in permeability to "Vistanex", which had a permeability approximately one-tenth that of natural rubber. Gray, a superior of Herzegh, on October 15, 1943, wrote that "it is the opinion of the B. F. Goodrich technical men that butyl is a satisfactory rubber for tubes."

20. Except (perhaps) the British "Killen" patent discussed at length below.

Seddon—No. 774,790, application November 24, 1903, patented November 15, 1904. A pneumatic tire in which "no separate air chamber or tube is required, as the tire forms an air-tight tube when secured to the felly [rim] of the wheel." The device shown was an annular endless tube [tire] in which the lip went down into the rim and was tightly clamped.

Duryea—No. 776,650. Application January 16, 1904, patented December 16, 1904. A pneumatic tubeless tire, in which the bottom surface of the air-retaining chamber was the "iron tire" or rim. The patent recited:

"While the ordinary tire-casing if given an inner coating of rubber suffices ordinarily to hold the air properly, it is preferable that the rubber should be thicker, or slightly corrugated along the edge of the tire, as shown in Fig. 1A. These corrugations being of soft rubber flatten down under pressure and insure that any roughnesses or depressions in the metal are closed and make a more effective joint than if flat rubber alone is used * * *." (P. 3, ls. 59–69).

The claims were for an air-tight inner wall; an air-retaining shoe; and "inner air-retaining lining"; and an air-tight inner wall.

Neary—No. 779,731. Application May 28, 1904, patented January 10, 1905. A "vehicle tire" in one form of which "the inner air-holding tube may be omitted," the rim base constituting part of the air container. The tubeless tire was to be formed by

"* * * lining the inner surface of the members 8 [side flanges] and the outer surface of the rim 6 lying between them with a layer of soft rubber or equivalent material * * * and extending the rubber surface of the tire shell in a thin layer entirely around the rim-engaging surface of the base, * * * and also over the inner surface of the shell, so as to render the inner wall of the shell and the interfitting surfaces of the tire base and rim airproof under the internal pressure by the intimate contact of substances capable of making an air-proof joint when forced together under sufficient pressure." (P. 2, ls. 60–69).

Duryea—No. 875,053. Application April 8, 1907, patented December 31, 1907. Tire held by positive attachment to rim whether or not inflated. "My preferred construction, however, is to line the tire with a layer of rubber of sufficient thickness to retain the air without the use of the removable inner tube * * *." (P. 2, ls. 49–53).

Hartman—No. 927,793. Application February 28, 1908, patented July 13, 1909. "Pneumatic Tire and Clamping Means." A tire with inwardly extending edge-folds, chiefly of canvas, but internally and externally covered with rubber, one edge-fold having a small rubber or pliable sealing flange seat held against the other by internal air pressure, with no inner tube.

Clark—No. 1,079,397. Application June 17, 1913, patented November 25, 1913. A vehicle tire having flared channel bands, with flexible material, preferably rubber, to prevent water and dust entering the space between the bands and the casing.[21]

Allen—No. 1,134,660. Application August 28, 1914, patented April 6, 1915. A pneumatic tire on a conventional wheel and rim with a locking flange, and with an inflation valve fitted so that no air can leak. The object is stated (P. 1, ls. 34–52):

"The main object of the present invention is to dispense with the inner inflatable sack or tube of pneumatic tires, it being well known that one of the serious objections to such

---

21. Compare Herzegh patent, Col. 2, ls. 29–32:
"Further objects are to provide for sealing against entrance of air, water,

sand or other substances between the tire bead portions and the rim flange, to provide for maintaining the seal * * *."

a tube is the deterioration which the tube suffers from the heat resulting from the friction between it and the outer casing. The consequence is that the inflatable rubber member rots and soon disintegrates and must be discarded. In lieu of the inflatable tube I provide an outer casing with an inner lining of rubber cured to the casing, making special provision for securing such a casing to the rim of the wheel and making the same air tight. By eliminating the inner tube, I do away with crimps, pinches and valve-leaks, and other disadvantages, as will be fully apparent from a detailed description of the invention which follows:

The lining and seal are thus described, (P. 1, ls. 60–80):

"In the present embodiment of my invention I provide the casing C with an inner rubber lining a cured to the casing wall, said lining extending over the inner faces of the beads b forming the edges or margins of the casing, the outer faces of the beads as well understood, being engaged by the flanges E, E', above referred to. Spanning the distance between the beads b, b, of the casing C, and cemented or otherwise secured air-tight to the inner lining a of the casing, is a web of rubber d, the marginal portions or sides of which engage the lining a the full extent of the inner faces of the beads b, b. This web together with the lining a of the casing forms an air-tight annular chamber P about the rim of the wheel, and is an admirable substitute for the prevailing inner inflatable tube of the conventional pneumatic tire."

Evans—No. 1,154,497. Application October 2, 1914, patented September 21, 1915. Along the points of contact of the tire and wheel rim (the latter being a part of the air chamber), forming

rings may be placed in the bottoms of channels, the rings being of flexible materials such as rubber. The outer sides of the rings are preferably corrugated, the meeting faces of the beads having corresponding matching corrugations.

Demas—No. 1,261,012. Application October 26, 1917, patented April 2, 1918. In a tire casing or shoe there is an "inflating strip * * * formed of suitably strong and flexible rubber * * * designed to take the place of the ordinary inner tube * * *."

Saylor—No. 1,278,224. Application March 6, 1917, patented September 10, 1918. An inflatable vehicle tire not requiring the use of an inner tube, in which the tire is tubular, but split on the inner periphery so it can be opened, closed and resealed, with a liner of soft rubber secured to the canvas and forming a permanent part of the tire.

Holczer—No. 1,323,457. Application March 8, 1918, patented December 2, 1919. A vehicle wheel tire and rim,[22] to eliminate the inner tube, between the flanges and beads there being strips of soft, resilient vulcanized rubber "to insure an air-tight joint."

Boys—No. 1,326,437. Application December 23, 1916, patented December 30, 1919. A tire "lined with a layer of good, air-tight rubber which, in conjunction with the air-tight metal periphery of the felly [rim], serves the purpose of an inner tube." The rim is grooved, the tire edges having corresponding ribs.[23]

Budd—No. 1,347,439. Application May 23, 1918, patented July 20, 1920. A tire casing seal in which a one-piece sealing ring of soft rubber is located internally between the beads, the internal air pressure effecting a seal between the outer surfaces of the beads and the rim flanges.

Baldwin—No. 1,389,024. Application October 22, 1919, patented August 30, 1921. A pneumatic tire, in which, hav-

---

22. The patent calls for a special and unusual form of rim and tire.

23. The liner is primarily significant in this suit, as the patent shows bolts through the flanges, to provide pressure.

ing provided an air-tight seal, "the casing may be rubberized internally or treated with any desired leak-proof mixture or solution." (P. 1, ls. 9–17).

Martin—No. 1,412,535. Application April 11, 1919, patented April 11, 1922. A pneumatic tubeless tire with thick lining of "soft rubber compound of good quality, any suitable compound of self-sealing character being employed."

Johnston—No. 1,541,508. Application January 16, 1920, patented June 9, 1925. A "single tube" tire, with a relatively soft rubber lining around the inner wall, which may "extend along the rim contacting surface [rim base] to the rim flange * * *."

Linwood—No. 1,608,703. Application November 4, 1925, patented November 30, 1926. A vehicle tire without an inner tube, with a casing "provided with a rubber lining integral therewith." The tread and sidewall stock terminate short of the rim flanges, and the beads, of carcass stock, directly contact the rim flanges.

Mack—No. 1,653,054. Application February 15, 1926, patented December 20, 1927. The purpose of the patent is to secure an ordinary tire casing upon the rim in such a manner as to form an air-tight closure or seal and to dispense with the ordinary inner tube. Upon the rim between the casing beads is a soft rubber element. Seated upon this element is a high pressure sealing casing from each side of which there extends a flap "preferably of some soft material, such as an inner tube rubber, which may be integral with" the casing or separate and vulcanized to it, each flap being passed around one of the beads of the tire lining between the bead and the rim, and extending up to and beyond the top of the rim flange. The proposed pressure of 125 pounds would bind the flange against the beads with an air-tight contact and the sides of the tire adjacent the beads would be forced outwardly.

Shoemaker—No. 1,756,665. Application November 19, 1925, patented April 29, 1930. A semi-tire is shown, one-half the air being retained within a recessed rim. The portions of the tire beads engaging the rim are preferably formed of harder rubber than the remainder of the tire. The rim has edges flanged outwardly inclined in such direction that their planes if projected would intersect within the recessed rim, the incline being such that the air within the tire would force the bead portion outwardly and up the inclines of the rim flanges. The specification asserts that if the tire is greater than a semi-circle,[24] the bead portions will be forced outwardly and up the inclines and "will be seated so firmly on the bead receiving portions * * * of the rim that they will form an airtight joint permitting the tire to be used without an inner tube."

Conigrave—No. 1,842,315. Application November 27, 1929, patented January 19, 1932. In a "cavity wheel" device eliminating an inner tube, "beadings" of a more pliable material or nature than the main body of the "tyre" extend from the outside across the bead base and up inside the tyre. These beadings act as a seal, packing and wearing agent, and may be made integral with the tyre or be made grooved and attachable thereto.

Daddio—No. 1,886,470. Application July 16, 1930, patented November 8, 1932. An "inner tube" is provided, open throughout its length, its edges resting upon a filler which is highly elastic and pliable, the filler member being interposed in the manner of a cushion between the rim and tire beadings. In substance, the filler member is the equivalent of a single chafer strip, not built integrally with the tire or tube, extending from the top of one rim flange to the top of the other rim flange across the base of a flat bottomed rim.

Bull—No. 1,966,580. Application December 23, 1932, patented July 17, 1934. This patent, assigned to defendant, relates to a method for mounting tires. It

24. The conventional tire is greater than a semi-circle.

is significant because it refers to an abandoned application [25] for tubeless tires heavily relied upon by defendant as an anticipation, and embodies illustrations of a sealing device in the form of "rubber gaskets" disposed externally of the bead portions of the tire and cooperating with the flanges of a drop center rim to form a "fluid tight seal between the tire and rim without the use of a conventional inner tube." [26]

Daddio—No. 1,982,135. Application July 5, 1932, patented November 27, 1934. The tire is lined with soft rubber as a sealant and is mounted on a slightly modified drop center rim. When mounted, the beads rest against the bead seats "with a certain amount of pressure so as to make the chamber which is formed by the shoe [tire] and frame wheel, comparatively air tight.[27]

Shoemaker—No. 2,186,178. Application February 11, 1937, patented January 9, 1940. The main [28] bead portions of the tire are supported by the conventional drop center rim. Provision is made for a chafing strip preferably imbedded in the bead portion of the tire so as to extend around each main bead ring just

outside the reinforcing layer. The outer end of the chafing strip terminates within the side walls of the tire. As to the sealing of the main beads the patent states, (P. 2, Col. 1, *l.* 70 and Col. 2, *l.* 1):

"The tire is completely lined with air tight rubber lining and this rubber extends around onto the base of the bead portions so that when said bead portions are crowded out and caused to bind tightly on the inclined portions 5 of the rim an air seal will be formed and no inner tube will be necessary."

The bead lock principle and the positioning of the main beads on the rim flange are startlingly similar to those taught by the Herzegh patent.

McMahan—No. 2,331,795. Application December 18, 1940, patented October 12, 1943. Discussed infra, under Prior Art cited by the Patent Office.

Godsey—No. 2,410,209. Application September 15, 1941, patented October 29, 1946. Among the objects of the invention are, (Col. 1, ls. 10–23):

"A further object of this invention is to eliminate the use of the con-

---

25. McNeill and Eger, assigned to defendant, and discussed, infra.

26. The relevant portions of the specification, (p. 1, ls. 18–28 and 70–82) are as follows:

"In the co-pending application of Mc-Neill and Eger, Serial No. 647,730, filed Dec. 17, 1932, there is [sic] shown and described tires which are adapted to co-operate directly with such rims, and provide a fluid tight seal without the use of inner tubes. The present invention particularly relates to methods for perfecting an initial seal between such tires and rims, which seal becomes effective before the internal fluid pressure within the tire is sufficient to insure the functioning of the seals between the rim and tire beads.

\* \* \* \* \*

"Referring particularly to Figs. 1, 2 and 3, a vehicle tire 1, illustrated as an automobile tire, is provided with sealing devices 2 illustrated in the form of rubber gaskets disposed externally of the bead portions of the tire, and which co-

operate with flanges 3 of a rim 4, illustrated in the form of a drop center rim, for completing a fluid tight seal between the tire and rim without the use of a conventional inner tube. The rim 4 carries a valve stem 5 for co-operation with an air chuck 6. The rim 4 may be mounted on a spoked wheel, either wooden or wire spokes, or on a disc wheel, as desired. In Fig. 1 a disc wheel 7 is illustrated."

27. Because of the "high pressure" required in tires, the inventor employed "an annular pressure element in form of a spiral spring \* \* \* so that the coils of the spring will press against the layer of soft rubber on the inner surfaces of the beads and press this rubber with the rims in opposite directions against the flanges \* \* \* of the frame wheel, thus sealing the latter with the shoe, and insure a perfectly air tight chamber \* \* \*."

28. The patent discloses secondary bead rings positioned outwardly and spaced apart farther than the main bead rings.

ventional annular inner tube by substituting a band of elastic material such as rubber or the like, which will be connected at its edges to the wheel rim in air-tight manner, whereby said band and the wheel rim together serve as a substitute for the conventional inner tube.

"A still further object of this invention is to provide for supplementing the adhesion of the inner strip to the wheel rim by pressure exerted by the tire casing, this constituting a pressure sealing means."

Reference is made to an inner band preferably of rubber, lining the entire inside of the tire and extending around sufficiently to cover the rim base, and in one illustration to cover the bead flange face.

Young—No. 2,489,995. Application November 27, 1944, patented November 29, 1949. Described infra, under Prior Art cited by the Patent Office.

Plaintiff's Departure from the Patented Liner and its Placement.

(a) Tubeless Tires with puncture sealant

1. Production Period, November 1947 to November 1948.

Plaintiff first offered tubeless tires for public sale on February 2, 1948. These had an unconventional plylock.[28a] After manufacture of the first 18,000 tires, a change in the plylock was made. The tires, until November 1949, incorporated [29] the patented claims of a liner of all (new) butyl rubber on the inner surface of the inner ply of the tire, and the inner ply, with the butyl liner coated on its inside surface, extended to the corner of the heel of the bead on each side of the tire. During this period the one-piece sidewall and tread stock extended slightly around the heel of the bead on each side of the tire and lapped the edge of the liner. Beginning in the last months of the period, the one-piece sidewall and tread was trimmed off, during the building operation, at the heel of the bead on each side of the tire.

The sealing ribs were formed in the one-piece sidewall and tread, which was made of a natural rubber tread-type stock.

The Herzegh patent recognized the "natural reluctance" of butyl and other rubbers to adhere, but taught that the inner liner was built into the tire and adhered by its natural tack or with the aid of adhesives, providing a unitary construction on vulcanization. Plaintiff's expert testified that the adhesion was adequate because the air pressure tended to hold the liner against the first ply.[30]

But the poor adhesion of the liner caused considerable trouble. This was reflected in a very large proportion of unsatisfactory tires. The rate of adjustment on conventional tires was in the order of 1% or less; the adjustments on tubeless tires in 1948 amounted to about 23%.[31] Of these, 9% were due to bead failure, and an unidentified number from ply separation and blisters.[32] These defects were readily recognized by plaintiff in various memoranda in 1947 (after Herzegh's filing date); and as late as November 11, 1947, the technical head of plaintiff's Tire and Equipment Division said, less than three months before the release of commercial tires:

28a. The Herzegh patent does not prescribe any particular form of plylock.

29. The reference is to the condition existing prior to vulcanization. Both plaintiff and defendant admitted that in many instances sidewall stock would and does flow during vulcanization.

30. This would be equally true of a butyl inner tube.

31. Plaintiff's expert explained this in part

as resulting from a very liberal adjustment policy on a new product; sometimes, when one tire failed, a whole new set would be given in exchange. For the six and one-half years from January 1, 1948 to June 30, 1954, plaintiff made adjustments for defects on 401,710 tubeless tires of the total of 2,604,154 such tires sold during that period, or on 15.4%.

32. The very defects ascribed to the McGay tubeless tire, infra.

"I am still not sold on the point that we have worked out a satisfactory method of production that will insure a high degree of tires that will do what we claim of them."

2. November 1948 to March 1949.

After the manufacture and sale of approximately 70,300 tires of the first construction, a substantial change was made. Plaintiff departed from the unitary liner in which Butyl was the only rubber component, and has never returned to it. In this second period, the liner was constructed of three plies, the center being of all new butyl, and the other two plies of of a blend of replasticized butyl rubber with some natural rubber, giving far superior adhesive qualities than all butyl. The liner was about 50% thicker than the unitary butyl liner of the first period.

A separate piece of liner extended to the corner of the toe of the bead on each side of the tire. An extension, of the two adhesive layers, ran from a point above the bead to a point above the bead heel, being lapped by the sidewall on one side, and by the three-piece liner on the other.

The sealing ribs, as in the first period, were formed in the one-piece sidewall and tread, which was made of a natural rubber tread-type stock.

Approximately 11,000 tires were made and sold during this period.

3. February 1949 to October 1952.

In this construction period, the liner was made up of two plies of replasticized vulcanized butyl rubber with some new natural rubber, or both natural rubber and butadiene-styrene synthetic rubber (GR-S). The first·or innermost liner ply extended around the heel of the bead on each side of the tire and was lapped by the one-piece sidewall-tread. The second liner ply ended at the corner of the toe of the bead on each side of the tire.

Approximately 1,508,000 tires of this construction were manufactured and sold.

4. October 1952 to September 1953.

GR-S was used for the one-piece sidewall and tread. The sidewall stopped short of the heel of the bead, and a cushion or chafer strip of tread-type natural rubber stock either met or lapped the edge of the sidewall, and extended around the heel of the bead, terminating under the bead base.

During the first few months the two-ply liner corresponded in position, extent and composition with that of the preceding period. Beginning in June 1953, both plies were extended around the heel of the bead, terminating beneath the cushion or chafer strip and the margin of the sidewall.

Commencing in March 1953, the liner composition was modified to include·replasticized butyl rubber (40%), new butyl rubber (10%), new natural rubber (20%·), and new GR-S (30%), one-half of the rubber content thus consisting of the two butyl ingredients.[33]

The sealing ribs were formed partly in the cushion or chafer strip, and partly in the sidewall material, the chafer strip being of natural rubber and the sidewall of synthetic rubber.

Approximately 740,000 tires of·this construction were manufactured and sold.

5. September 1953 to January 1955.

This new composition was disclosed in plaintiff's Sarbach patent.No. 2,676,636, issued April 27, 1954 on an application filed June 18, 1949. Among the patents cited by the Patent Office in the Sarbach file is the Herzegh patent No. 2,587,470 in suit. This means that (at least insofar as the Patent Office is concerned) *Herzegh did not disclose in his patent the liner which plaintiff has used exclusively since March 1953 in its tubeless tires.*

33. This lowered the "relative" or "substantial" impermeability of the liner to 65% that of the only example given in the Herzegh patent, which was the 100% new butyl rubber liner used during the first production period. Plaintiff's expert testified that the original composition gave a greater margin of safety than was necessary, and this excess was sacrificed for convenience in manufacture—especially to secure much-improved adhesion of the liner to the other stocks used in tire production.

In this construction, the cushion or chafter strip described in period 4 above was eliminated and the synthetic rubber tread-type stock in the one-piece sidewall and tread was replaced by a natural rubber tread-type stock.

The liner, of the same composition as in period 4 above, of two plies in some instances, extended around the heel of the bead and up the outer face of the bead and was lapped by the sidewall.

**6. July 1954 to December 1954.**

The two ply liner terminated at the corner of the bead toe and was of the same composition as described in period 4. The one-piece sidewall and tread was made of tread-type natural rubber stock. A fabric finishing strip, coated on the inner surface with liner stock and on the outer face with tread-type natural rubber stock lapped the liner at the inner face of the bead and was in turn lapped by the one-piece sidewall and tread at the outer face. The sealing ribs were formed partly in the natural rubber coating on the finishing strip and partially in the natural rubber of the sidewall, which were of similar character.

Approximately 1,480,000 tires embodying the structures described in periods 5 and 6 above were manufactured and sold.

**7. November 1954 to March 1955.**

The construction was substantially the same as that described for period 3, except the liner composition was the same as described in periods 5 and 6 above.

Approximately 160,000 tires embodying this construction were made and sold.

**8. March 1955 to date.**

The two-ply liner extends just around the corner of the toe of the bead, and is lapped by a finishing strip which is, in turn, lapped at the outer face of the bead by the one-piece sidewall and tread made of tread-type synthetic rubber stock. The finishing strip is coated on its inner

surface with liner stock and on its outer surface with a tread-type natural rubber stock.

The sealing ribs are formed partly in the outer coating on the finishing strips and partly in the sidewall, the former being of natural rubber and the latter of synthetic rubber.

Tires of this construction have been and are being made and sold at the rate of approximately 100,000 per month.

All tires produced under the foregoing descriptions contained a crown of puncture sealing material, which extended down only a short distance below the tread. Admittedly, the problems of liner and sealing in the bead areas are identical whether or not a puncture sealant is used.[34]

Tubeless tires without a puncture sealing crown were not produced by plaintiff until 1953. Two different forms of construction for tubeless tires without a puncture sealant have been used, both being in current production. The liner compositions in each are like those used in current production of the puncture-sealant tires, one-half the rubber content consisting of two butyl ingredients, the other one-half consisting of new natural rubber and new GR-S.

**(b) Tubeless Tires without puncture sealant**

**9. January 1953 to date.**

The same two-ply liner is used as in the case of tubeless tires with puncture sealant since February 1949, in some instances the first or innermost liner ply terminating at the heel of the bead, the second liner ply terminating at the toe of the bead. In other instances, both liner plies extend to or around the heel of the bead.

The one-piece sidewall and tread is made of a tread-type synthetic rubber stock, and terminates short of the heel of the bead. The sidewall portion laps a

---

34. Other questions with respect to tubeless tires with sealant, including exploitation and advertising, and even in connection with prosecution in the Patent Office, are material in other respects, but not as to plaintiff's efforts to solve questions of ply separation, sealing, materials and construction.

tread-type natural rubber cushion or chafer strip, which extends around the heel of the bead, and which in turn laps one or both of the liner plies. The sealing ribs are formed partly in the cushion or chafer strip, and partly in the sidewall material, the former being of natural rubber and the latter of synthetic rubber.

10. January 1955 to date.

Each of the two plies of the liner terminates just beyond the toe of the bead.

The one-piece sidewall and tread is made of tread-type synthetic rubber stock. The sidewall edge laps a fabric finishing strip, which extends around the bead area, and in turn laps the liner plies. The fabric finishing strip is coated on its inner surface with liner stock, and on its outer surface with a tread-type natural rubber stock.

The sealing ribs are formed partly in the outer coating on the finishing strip, and partly in the sidewall, the former being of natural rubber and the latter of synthetic rubber.

Approximately 3,800,000 tubeless tires without sealant were manufactured and sold prior to June 30, 1955. Production is continuing at the rate of approximately 700,000 per month.

All the foregoing descriptions relate to tubeless tires, whether with or without sealant, having black sidewalls. The construction of plaintiff's tubeless tires with white sidewalls is the same, except that in such tires a separate tread-type natural rubber cushion or chafer strip is applied in the bead area of the white wall side of each tire. In the construction where a cushion or chafer strip is not present (Nos. 1, 2, 3 and 5 above), this feature is added on the white wall side of the tire only. This cushion or chafer strip either laps or is lapped by the radially innermost margin of the white sidewall material. The sealing ribs are formed at least in part in the cushion or chafer strip, although some of the ribs may be formed in the white sidewall.

### Summary.

In the first production period, November 1947 to November 1948, in which 70,300 tubeless tires (with sealant crown) were produced, the liner was of butyl rubber, and extended down to the bead portions, around the toe of the bead and to the heel. The patent drawings and this initial production had the butyl liner in engagement with the rim base from the bead toe to or almost to the bead heel. The sealing ribs were of the same material as the sidewalls (of one-piece natural rubber sidewall and tread stock). This left a space between the bead heel and the first rib without the protection of the liner. Thereafter construction was repeatedly changed and the liner was extended around the bead heel and inside the sidewall and/or chafer material, at least to, and in almost all instances well beyond, the first (lowest) sealing rib.[35]

For about four months after November 1948 a three-ply liner was used, a ply of all new butyl being sandwiched between two plys of replasticized butyl rubber and natural rubber, more permeable but also more adhesive[36] than butyl rubber.

35. This may be an oversimplification, but correctly states the effect of the changes in liner "stock" termination. In production period 2, "an extension" of the liner is mentioned, and beginning in July 1954, the chafer or finishing strip was coated on the inner surface with liner stock and was coated on the outer surface with natural rubber. The point is that since the original construction (November 1947–November 1948), directly applying the teachings of the patent, the liner or liner stock has been materially extended around and up the bead heel and bead flange area to protect the beads from exposure to air under pressure.

36. Sarbach referred, (Col. 1, *l.* 35–Col. 2, *l.* 2) to the "many problems" presented by the use of a butyl liner, "the most important being due to the inherent nature of" butyl "not to adhere to other rubbery materials", and that the gums and adhesives to adhere the liner to the body "have not proven to be satisfactory and many manufacturing difficulties have arisen * * *." Chafing and frictional deterioration of conventional butyl liners were also mentioned.

Then the middle ply was eliminated, and from March 1949 to date the liner has been two-ply. Until March 1953, various proportions of replasticized vulcanized butyl rubber, natural rubber and GR-S synthetic rubber were used. Since March 1953 the two liner plies have used the Sarbach formula, each being composed of one-half replasticized butyl rubber and new butyl rubber, and one-half of new natural rubber and GR-S.

Beginning with October 1952, chafer strips of natural rubber have been used, in which some or all of the sealing ribs are formed. The extent of the chafer has varied from a small strip in the rim flange area to a strip extending from above the beads around the bead heel to, around and above the bead toe. In such cases, which represent current production, the chafer strip is in contact with the metal rim flange and rim base,[37] and directly in contact with the enclosed air in a portion of the tire above the bead toe.

Under current construction some of the sealing ribs are molded in the synthetic rubber side wall and part in the natural rubber outer portion of the chafer strip.

#### Defendant's Efforts in the Tubeless Tire Field.

From 1929 to 1939, defendant worked on tubeless tires, including various experimentations, the building of 150 tires, the filing and abandonment of one patent application[38] and the securing of the Bull patent No. 1,966,580. This involved work both with respect to inner linings and sealing at the rim.

The recognition that the problems in the production of tubeless tires were with relation to a liner less air permeable (or more diffusion resistant) than the balance of the tire, and an effective air seal between the flange face of the bead and the rim flange, is well demonstrated by the memorandum of June 23, 1932 of Dr.

Bull (defendant's expert at the trial), in which he said:

"3. An extra coating of rubber must be applied to the band ply and probably to the chafer strip of the tire to provide a section of low air permeability. This is necessary to prevent blistering of the tire due to diffusion of air through the carcass and accumulation under the tread. To avoid blistering it is necessary that the rate of diffusion of air through the band ply shall be slower than through any equal gauge of material in any other portion of the carcass. The use of 'balloon dope' or other solution for reducing the diffusion rate of air through the band ply may be desirable.

"4. It may be necessary to put a sealing strip of rubber around the outside of the bead so an air tight seal can be maintained against the rim flange."

In the experiments, conventional passenger car tires were coated on the inside of the innermost ply with a rubber coat .020″–.060″, or in some instances the coat was placed between two of the carcass plies. The inner surface of such tires was also treated with various substances, including cements.

In addition to experimentation on diffusion resistant liners, defendant's efforts also were directed to the problem of effecting an air seal between the tire beads and the rim. Efforts were made to effect a seal between the toes of the beads and the rim. More experimentation was directed toward effecting a seal between the outer or flange faces of the beads, and the rim flanges. These included the use of a strip of white sidewall stock cemented to the outside of each bead on a finished tire; the formation on the flange face of the beads during vulcanization of two small sharp cornered strips

---

37. Sarbach stated, (Col. 7, ls. 50–55):
"It was found that the conventional 'Butyl' liner chafed rapidly at those portions contacting the wheel rims becoming unsatisfactory as an air-impermeable

element after the tire had been driven about 5,000 miles * * *."

38. McNeill and Eger, infra.

of soft stock, by means of grooves cut into the mold parts; a single, wider strip, with rounded corners, on each bead; and larger single strips. Another construction involved use of a strip of gum stock cemented to the inner surfaces of the rim flanges; and a combination of a tube, flap and valve assembly.

Approximately 150 tires were built by defendant in its tubeless tire development between October 29, 1929 and November 2, 1939. The results were unsatisfactory from the standpoint of commercial production.

Presumably defendant's work during the period 1929–1939 would not have been contemporaneously available to plaintiff, or the public. However, that part of such work represented by patent application of defendant's employees McNeill and Eger, and a patent granted on July 17, 1934, to defendant's expert Dr. Bull, became part of the public domain on the issuance of the Bull patent. The disclosures in the McNeill and Eger application represent an important part of defendant's defense.

### McNeill and Eger abandoned patent application.

■ On December 17, 1932, after the advent of the drop center rim, George K. McNeill and Ernst Eger, employees of defendant and as assignors of defendant, filed an application for a patent for tubeless tires.[39] The invention was stated to relate to "tubeless vehicle tires, and more particularly to tubeless vehicle tires which are used in conjunction with air tight rims * * *. Broadly, the construction is made fluid tight by insuring that the carcass of the tire is fluid tight and by providing special sealing means for co-operation between the bead portions of the tire and the rim."

A lining is provided to render the carcass "fluid tight", with "portions extending around the bead portions * * * of the tire for engagement with the rim seats to insure fluid tight seals between the bead portions and the rim."

The composition of the liner was described as follows:

"The word 'lining' as used in this specification is intended to cover the use of any [40] material which may be applied to the interior of a conventional tire for rendering it air tight. It may take the form of a coating of rubber applied to the exposed surface of the inner or band ply of the carcass, or it may take the form of a specially compounded ply of fabric and/or rubber applied beneath the usual inner or band ply of a tire. The material must have the properties of being flexible, fluid tight, and non-cracking in use. It may also be painted or sprayed with a latex or other solution. In any event, the lining used should decrease the permeability or porosity of the inner or band ply of the carcass; also, it must be of a sufficiently soft nature to co-operate with metal to act as a seal."

Figure 2 and the specifications relate to the addition of one or more ribs "externally of the bead portions * * * for directly engaging the rim flange to serve as a gasket."

These ribs were to be of the same material as, and molded integrally with, the liner material.

Figure 4 and the specifications cover the provision of a thickened body of flexible material to the lining at its lower edge [bead toe] which may be extended "outwardly between the tire and flange"

---

39. This application was put in evidence by *plaintiff* in its case in chief, without reservation, and its expert was examined upon it at length. This would seem to make it available as evidence of prior knowledge. 35 U.S.C. § 102(a). Moreover, having been referred to by Bull in his specifications in Patent No. 1,966,580, it became part of the disclosure set out therein. Application of Heritage, 1950,

182 F.2d 639, 643, 37 C.C.P.A.,Patents, 1109. (On the Patent Office check sheet of the McNeill and Eger application a sticker is affixed bearing the legend: "This application referred to in Patent No. 1,-966,580. Do not destroy. ( (See order No. 3,166,400 O.G.1) ) *Do not detach."* All except the numerals 1,966,580 is printed.)

40. Compare Herzegh claim 20.

555

terminating in a free portion "of rubber and/or fabric composition, which overhangs the edge of the flange." Figure 4 indicates that this "thickened body of flexible material" is of material different from the liner.

Provision is also made for a "gasket or a lining" of "rubber or other flexible sealing material" inserted in a pocket in, or secured to, the inner surface of the rim flange.

In summary, it is stated that:

"In the several forms of the invention an inner tube is dispensed with by providing that the inner surface of the tire shall be relatively fluid tight, and by providing means for sealing the spaces between the tire beads and the rim so that the inflating pressure within the tire reacts on the bead portions of the tire and against the rim to produce a permanent seal."

Fifteen claims were filed. The Examiner held that: "Claims 1, 2, 3, 10 to 15 [41] inclusive are rejected as obviously met by Killen." The response of the applicant was: "Cancel Claims 1 to 3, inclusive, and 7 to 15, inclusive." The remaining claims were amended, and an additional claim, 16, added:

"16. In a tubeless tire, a continuous lining of sealing material secured to the interior of the casing, and extending around the bead portions of the casing and terminating in raised circumferential ribs on the outer face of the casing in position to engage rim flanges to seal the spaces between the bead portions of the casing and said rim flanges."

This is the only claim referring to ribs. It was rejected by the Examiner for the following reasons:

"Claim 16 is rejected on Duval in view of Nordisk. It would not in-

41. "1. The combination with an automobile tire and rim, of a body of rubber disposed adjacent to each bead portion of the tire for sealing the spaces between the tire and the rim, whereby an inner tube for the tire may be omitted.

"2. The combination with an automobile tire and rim, of a body of sealing material disposed adjacent to each bead portion of the tire for sealing the spaces between the tire and the rim, whereby an inner tube for the tire may be omitted.

"3. The combination with an automobile tire and rim, of a body of soft rubber disposed adjacent to each bead portion of the tire for sealing the spaces between the tire and the rim, whereby an inner tube for the tire may be omitted."

"10. In combination, a tire, a rim, means for sealing the spaces between the bead portions of the tire and the rim without the use of an inner tube, and valve mechanism mounted on said rim and communicating with the interior of the tire.

"11. In combination, a tire, a rim, means for permanently sealing the spaces between the bead portions of the tire and the rim without the use of an inner tube, and valve mechanism mounted on said rim and communicating with the interior of the tire.

"12. A pneumatic support for motor vehicles * * * said rim and tire

casing when the inextensible bead portions of the latter are positioned on the seat portions of the rim being air-tight excepting only between the bead portions of the casing and the portions of the rim with which they are in contact, and means for preventing escape of air supplied under pressure directly to the interior of said tire casing and rim when the inextensible bead portions of the former are in separated and spaced apart service position thereon.

"13. A wheel for motor vehicles * * and means operable by the air under pressure within the flexible member and rigid element for preventing the escape of air from between the bead portions of the member and the element.

"14. A wheel for motor vehicles * * and means operable by the air under pressure within the flexible member and rigid element for preventing the escape of air from between the bead portions of the member and the element, said last mentioned means being permanently secured to either said member or element and adapted to be sealed against said member or element as the case may be.

"15. A wheel for motor vehicles * * and means permanently secured to one of said members and operable by the air pressure within said members for preventing the escape of air from between the cooperating faces of said members."

volve invention to provide the Duval lining with ribs on the outer sides of the beads after the manner of Nordisk. The Nordisk projections are intended to provide a seal against the entrance of water and dust but since Duval provides a seal against the loss of air no invention appears in using these projections in the Duval device to prevent loss of air. The problem is the provision of a seal in either case."

The remaining claims were amended, with the statement under "Remarks" that:

"All of the claims now in the case cover a tire in which a lining is mounted internally of the casing and extends around the bead portions so as to seal them against rim flanges. Also by having the lining extend around the bead portions, the edges of the fabric at the bead portions are covered and sealed. If the lining is not continuous around the base or bead portions, the air pressure within the casing may work its way up into the carcass between and/or through the plies and will cause either a slow leak or blister on the tread or side wall of the casing. This tendency to leak is increased when the tire is placed in actual service due to the flexing of the casing. Such a condition results in ply separation and premature failing of the tire. By placing the lining of sealing material around the seat of the bead portions such leakage is prevented as well as affording a seal between the casing and its seat on the rim flanges. The prior art cited in the last Office Action does not suggest such a construction, and it is submitted that the claims remaining in the case are allowable."

However, following the recommendation of April 9, 1934, of defendant's pat-

ent department made "in view of the last Office Action and references cited" by the Patent Office, defendant abandoned the McNeill and Eger application.

McGay "Tubeless Tires"—1942.

In July 1942, John B. McGay, a research engineer, and executive and part owner of a Tulsa, Oklahoma, manufacturing company, became interested in the possible manufacture of tubeless tires. There existed a shortage of natural rubber, and the existing war conditions had led to proposed rationing of tires and curtailment of travel. It occurred to him that if experimentation proved it feasible, the elimination of inner tubes would provide a saving of rubber in the production of new tires, and would provide a substantial source of very good reclaimed rubber. He had the tube taken out of one tire, and the tire was then remounted on his automobile, the valve being sealed by a gasket of "live" rubber. Although it was an old tire, it ran satisfactorily for 8–10 months. About a month later he had the tubes removed from the other tires on his auto.

The effort was publicized by McGay's neighbor, who was a newspaper editor. Others became interested, to the point where McGay prepared written explanations and sketches. These called for the vulcanization of any fabric breaks in the tires; the cleaning of the beads and smoothing of any rough places; the removal of any "corrugations" [42] on the beads; the insulation of the inflation valve; and recommended that a "good tire sealing fluid" be put into the casing which would tend completely to "seal all small holes which might be missed in inspection." [43] On one of the explanatory figures appeared the statement:

"Note that air pressure forces effective seal between smooth tire bead and smooth steel rim."

"In the hundreds" of installations in accordance with these instructions were

---

42. Apparently intended for venting any air captured between the inner tube and the carcass.

43. The context makes it entirely clear that the sealing was against holes in the tire fabric, and did not relate to the air seal at the beads.

made by a tire shop owner where Mc-Gay had his work done. Oil company and Government officials became interested. In response to an O. P. A. letter dated October 6, 1942 to McGay, expressing doubt that McGay had "discovered a method of sealing the tires at the rim seat", McGay replied that "out of some 600 tires mounted to date no instance is yet recorded of a leakage between the bead and the rim. The pressure of air pressing this bead up against the rim is so enormous that I believe there is no possibility of a leak ever developing at this point." He also later stated that a car with tubeless tires had already "gone 6,000 miles without accident or incident."

The Transportation Committee of the Petroleum Industry War Council set up a test program and on January 7, 1943, reported on results of testing 746 tires that:

"Finally

"(1) The tests have demonstrated that the principle of the tubeless tire is feasible and practical.

"(2) No practical application, universally, of the principle is possible with present tires under present conditions. The tests show that new tires and tires in A–1 Condition can operate satisfactorily without tubes.

"(3) The idea has large potentialities for rubber conservation and Messrs. McGay and Barnett, the proponents of the idea have made a real contribution to the future conservation of rubber."

McGay on deposition in the case at bar testified that "the tire would have to have some type of a liner which was impervious to air". This was evidenced by the newspaper report of an interview on November 24, 1942:

"suffice it to say that it indicates that if a thin skin of rubber—just a fraction of the amount that is in an inner tube, or a substitute for rubber is vulcanized to the inside of the casing when the tire is made, or when it is recapped under the government's program, no tube will be needed thereafter, nor will any sealing fluid be necessary."

Again, on November 28, 1942, it was reported:

"The Tulsa manufacturer said one more step might have to be taken before his plan could be regarded as 'absolutely foolproof.' This, he said, would be to insert an inner lining in the casing to prevent air filtering through after the tire has done 20,-000 to 25,000 miles.

"'Air might leak through a tire alone at that stage,' he said, 'so we're working on the idea of an inner lining not necessarily of rubber but a substitute for rubber.'"

And from the Washington Evening Star of the same date:

"Mr. McGay said that, before his plan is 'absolutely foolproof,' it might be necessary to insert an inner lining in the casing to prevent air filtering through after the tire has rolled 20,000 to 25,000 miles. This lining might be made of a rubber substitute, he added."

Before a subcommittee of Congress,[44] McGay was questioned with respect to possible inner linings, and particularly a synthetic called "Thiokol", and was asked if a synthetic would not be a fair substitute for an inner lining, to which McGay replied:

"Some of those would be better than rubber. For instance, some of them are not permeable to air as much as rubber. For instance, oh, neoprene, for instance, is only one fourth as permeable to air as rubber is."

In his deposition in this case, McGay further testified that he had a meeting with ten or fifteen engineers of the du-Pont Company in Wilmington, Delaware. At that meeting there was discussed the possibility of the production of a syn-

44. Report of Proceedings on December 1, 1942 before a Subcommittee conducting the Petroleum Industry Investigation.

thetic rubber or other synthetic material impervious to air that could be applied to the inside of a casing to prevent air seepage; "a satisfactory inner liner to be vulcanized inside the tire at the time it was made so as to absolutely prevent any seepage of air into the cords of the tire."[45]

On cross-examination McGay testified that he had used six tubeless tires on his own automobile, with no ply separation and only one blister. He further testified that leakage between the tire bead and the rim occurred upon only one occasion, where the tire when mounted had a bad bead. In addition, his testimony on cross-examination was that he never found it necessary to use any auxiliary means for sealing between the rim and the bead.

William F. Billingsley, Manager of the Construction and Design Department of plaintiff (and plaintiff's expert witness in this trial), visited Tulsa, Oklahoma, in the Fall of 1942, to check and report upon the McGay experiment. He was accompanied by a Government representative of the office of Defense Transportation. Upon his return, Billingsley circulated to representatives of ten of the tire manufacturing companies a report of this visit, prepared after a discussion with them at the Tire and Rim Offices, and purportedly approved by them. This stated in part, as follows:

"I gained the impression that the proponents of the tubeless tire plan were convinced that the plan was successful because a satisfactory air seal was easily obtained—*the beads stayed in place on the rim as well as when used with a tube—the air seal was not broken when operating over rough ground or around corners at high speed. This feature was readily admitted by tire engineers and the plan pronounced sound in this respect.* Tire engineers were very much concerned, however, because

experience led them to believe that air would seep thru the tire carcass to the tread or sidewall and accumulate in blisters—thus ruining the tire because of tread or sidewall separation. I was informed that practically all tire manufacturers had taken precautions against the trapping of air between the tube and the tire carcass, such as punching small holes through the sidewall, molding small ribs under the beads, and curing ribs on the outside of the tube to bleed off trapped air thru the valve hole.

"Most manufacturers have had at one time or another considerable trouble from tread and/or sidewall separation due to this trapped air. The air in a tubeless tire would act in exactly the same manner as trapped air. A committee of tire engineers predicted that a great deal of trouble in the form of tread or sidewall separation could be expected with tubeless tires at about half the normal tire life. The proponents of the tubeless tire plan are apparently completely unaware of this hazard."

At the trial plaintiff contended that the italicized portion quoted above meant only that the tires did not come off the rim when operating over rough ground; not that an effective air seal was effected. With this the court cannot agree. First, the language specifically relates to the "air seal". This was recognized as one of the two fundamental problems involved in the development of a satisfactory tubeless tire. Had the tires actually come off the rims during the trial runs, this would have been such a conclusive and unequivocal defect that it could scarcely have failed to be noted as such. Second, even with a tube, it is the air pressure, communicated through the tube and beads, that holds the tires on. Such pressure, as pressure, would be (at least substantially) the same, whether there

45. It was immediately after this conference, and after plaintiff's technical director of its tire and equipment division had talked with duPont on the same day, that plaintiff's "Test Program for Tubeless Tires" was launched.

were or were not a tube. Third, various tubeless tires have been and are held on the rims by pressure without ribs; e. g., plaintiff's truck tires; Firestone taxicab tires; defendant's latest model tires.

It therefore seems abundantly clear, and this court finds as a fact, that the McGay experiment (1) demonstrated that ordinary tires without a special lining and without sealing ribs on the beads, would effectively prevent an escape of air between the beads and the rim; and (2) recognized that for optimum results the tire should be lined by a material, preferably a synthetic material impervious to air, thus preventing the seepage of air through the tire carcass.

### The "Killen" Patent.

Defendant strongly relies upon the British Killen Patent 329,955, application date November 27, 1928, published June 26, 1930, and patented August 27, 1930, as a defense. This involves the claim of anticipation of the Herzegh patent by the Killen patent. It also involves the points that the Killen patent was cited by the United States Patent Office as the basis of the rejection of other applications for patents on tubeless tires; was the basis for the abandonment by defendant and a competitor of their applications for patents on tubeless tires; and as a negation of the inference of validity of plaintiff's patent by its mere issuance, in view of the fact that it was *not* cited by the Patent Office in the file of the Herzegh application.

■ The Killen patent is available both as the equivalent of a prior United States patent, and as in the same category as a publication.[46]

■ Defendant does not claim that the Killen patent was reduced to use, but correctly asserts that this is irrelevant on the question of whether or not its disclosures [47] constitute anticipation. Western States Machine Co. v. S. S. Hep-worth Co., 2 Cir., 1945, 147 F.2d 345, 350; Zephyr American Corporation v. Bates Manufacturing Co., 3 Cir., 1942, 128 F.2d 380, 382.

Killen stated that "one of the great bugbears in pneumatic tyres is the premature leakage of air", and he proposed a one-unit pneumatic tyre "which is burstproof, leakproof, punctureproof and foolproof as compared with any standard pneumatic tyre in use to-day, without requiring to use an inner air tube." A "leakproof compound liner" was to be fitted "homogenously to the total inner cord surface area of the carcase" with "inextensible leakproof base beads capable of airtight fitment to a * * * leakproof metal cover element[48] both fitted airtightly together * * *" and a "leakproof air valve."

" * * * The inextensible base beads are manufactured with endless rubber corrugations to ensure an airtight fitment thereof to the metal base bead seatings of the rim element of the tyre." The base beads "have endless corrugations thereon * * * the wide belly part * * * of the flexible cover * * * forming endless strengthening belly-protecting ribs * * * which ribs are the widest part of the flexible cover element * * *." The cover has a suitable "inner say rubber compound leakproof liner" fitted homogenously of a thickness "say quarter of an inch thick or more as required according to the work required" to render the carcase cover "leakproof per se".

The inner leakproof liner completely covers the inside to the right and left toes of each base bead, and "may be constructed with an extension or skirt beyond the toes of the base beads so as to engage with the metal rim element."

The base beads have endless rubber corrugations "which when the base beads are fitted to their suitable metal base bead seatings form airtight joints between the

---

46. Plaintiff so concedes.

47. Plaintiff agreed in its brief filed after completion of the evidence that the "Kil-

len patent is plain and easily understandable."

48. Quite similar in ten of the twelve drawings to the conventional drop-center rim.

endless rows of rubber corrugations * * * and their metal base bead seatings * * *." In Figs. 1, 3, 5, 7 and 10, corrugations formed of center stock are shown on the base beads and corrugations of *sidewall stock* are shown on the bead flanges.

In the conventional tire the height is 88–95% of the width, while in the Killen tire, the height is about 66% of the width. This results in rim flange air pressure in the Killen tire of about 60% of the lifting force, while in the conventional tire the rim flange pressure is about 150% of the lifting force. Further, the lining in the Killen tire (butyl rubber being then unknown) was thick as compared to any present commercial lining.

No commercial production under the Killen patent was proved. Defendant in 1955 manufactured, for purposes of this trial and not as commercial production, what its expert testified was a "Killen-type tire". The squat shape was preserved; and there were corrugations both on the bases [49] and on the rim-flange engaging faces of the beads, the latter being similar in size and shape to those the defendant had been using on tires for some time, and similar to those shown on the Killen drawings. Rubber was added to make the bead base serrations,[50] justified as being within the skill of the ordinary tire engineer;[51] and the lining was in the order of one-eighth inch, about one-half that shown in any of the Killen drawings.[52]

These tires were subjected to cleated wheel tests, high speed wheel tests, highway tests and cornering tests, and a vehicle with Killen-type tires was driven from Detroit to Baltimore and thence to Washington, D. C., and back. The court and counsel for both sides took a short ride in the vehicle so equipped, and the court could observe nothing unusual in the operation of the vehicle or in its functioning other than that the turning radius was materially restricted because of the width of the tires.

Although the thickness of the lining of the Killen-type tire constructed by defendant is criticized by plaintiff as having, as constructed, a liner more permeable than the tire body, plaintiff did not contend that a liner of the thickness shown in the figure of the Killen patent would not prevent diffusion of air into the carcass.[53]

Defendant's Killen-type tire appeared to be an operative tire. In any event, Killen called for a "leakproof" liner; Herzegh, for a liner "preventing objec-

---

49. Plaintiff's expert testified that corrugations on bead bases served no useful purpose in sealing, and, if anything, were inadvisable.

50. In the first "Provisional Specifications" Killen stated that (p. 2, ls. 7–16): "Each outer flexible road-contacting casing element has a wide right and left strong side wall and strong inextensible right and left straight-sided base beads, and on the extreme inner circumference and extreme right and left sides of each base bead suitable endless air-sealing corrugations of rubber may be formed which are integral with the inextensible base beads."; and (p. 2, ls. 84–90): "the leakproof lining running in endless formation across the extreme centre-line of the inner cord foundations of the flexible cover down each inner right and left side wall to and over the right and left toes of the base beads."

51. Plaintiff attempts so to justify its departures from the strict and literal teachings of the Herzegh patent.

52. So by experience plaintiff learned that its first construction (on the only specific teaching of the Herzegh patent) of a 100% butyl-type rubber lining carried an unnecessarily high margin of safety, and through the incompatibility of butyl-type and other type rubbers, introduced a commercially unsatisfactory lack of adherence. Plaintiff departed from the 100% butyl-type rubber lining after the production of 78,000 tires (with an internal or crown sealant layer) and has never returned to it, the present construction being only 50% butyl-type rubber, with about 60%–65% the impermeability of the original lining.

53. Permeability is in direct arithmetic proportion to the thickness of a liner.

tionable leakage into and through the wall of the casing" (Col. 1, ls. 9–11). Killen definitely taught bead-sealing ridges on the outer surfaces of the beads, of liner or sidewall stock.[54]

Wingfoot South African Patent.

On April 17, 1944, an "application and complete specification" for a patent was filed by Wingfoot Corporation, a subsidiary of Goodyear Tire & Rubber Company, as assignee of Elmer Fred Brunner, in the Union of South Africa. The application was accepted on August 4, 1944 and letters patent 463/44 were granted on November 17, 1944. Plaintiff concedes that this patent for the purposes of this litigation may be treated "as though it were a United States patent." [55]

Objects of the invention were to provide "tires having sealing means associated with the beads thereof whereby the tires can be mounted directly on rims and used without inner tubes * * * by the provision of relatively inexpensive sealing means directly and permanently built into the pneumatic tire itself for adequately sealing between the beads thereof when mounted upon a rim of an endless, integral, one-piece type, such as a drop center rim." Another object was stated to be the provision on the bead base of the tires of "alternate load bearing natural rubber ribs, and alternate sealing butyl rubber ribs."

In summary of the objects, the patent stated:

"The foregoing objects and other objects of the invention, which will become apparent as the description proceeds, are achieved by the provision of a pneumatic tire structure of the straight-sided, inextensible-bead type characterized by raised rubber ribs on the axially-parallel, flat, innermost face of the beads, the ribs ordinarily being of a thickness equal to less than about half of their width and being spaced apart by grooves substantially equal to the width of the ribs, said ribs being further characterized by being formed as a continuation of a sheet of rubber extending over the inner surface of the tire from bead to bead. In one form of the invention the ribs are made alternately of butyl rubber and natural rubber. *In another embodiment of the invention the ribs are of serpentine shape arranged circumferentially of the beads,* and still another embodiment replaces the ribs with a rubber lip or flap at the toe of the beads which engages in sealing relation with the rim upon inflating the pneumatic tire."

The liner is "preferably * * * made of butyl rubber and serves to prevent the escape of air or other fluid from the inside of the tire when it is mounted on a rim * * *." The lining is "preferably made of butyl rubber to insure the leak proof function of the assembly * * *. However, at least some of the advantages of the invention can be retained by the provision of a natural rubber lining for the tire, or by the use of a rubber lining made from a different type of synthetic rubber than butyl."

Figure 3 shows ribs on the bead base and bead flange, of the same material as the liner. Figure 4 shows the liner extending down and across the bead base and bead flange, with ribs on the flange face of the bead only.

54. Letter from plaintiff's patent counsel to its president, dated February 5, 1951:

"A most significant patent is Killen British patent 329,955 dated 1930, showing tubeless tires with beadsealing ridges on the outer faces of the beads, a heavy liner from ¼ to ½ inch or more in thickness, and optionally a puncture-sealant."

Substitute for the 0.25–0.5 inch thickness of Killen's liner, butyl of one-tenth the permeability of natural rubber—or .025–.050 inches, and the liner resemblance between Killen and Herzegh would be essentially complete.

55. Similar patents were applied for and granted in "about a dozen foreign countries", and applied for but abandoned in the United States. Brunner, the applicant in each, was at the time an employee of Goodyear.

Plaintiff's expert testified that butyl ribs on the flange face of the beads would not be satisfactory, as butyl would not provide the desired toughness, nor satisfactorily withstand permanent set and chafing; that in a tubeless tire the seal and the liner have different properties, and what would be ideal for one would not be for the other; and that he had never seen adequate ribs of butyl. Defendant's expert testified that it would not have been difficult in 1944 to compound butyl that would be an adequate diffusion barrier as a liner, and have adequate abrasion resistance in the rib portion. He testified that by a compromise of formulae known in 1942 [56] for butyl inner tubes and butyl treads a highly impermeable lining could be made which would have adequate abrasion resistance in the ribs. This testimony was not challenged on cross-examination, and is supported by plaintiff's Perkins patent No. 2,698,042, issued December 28, 1954, on an application filed September 13, 1950, illustrating and describing a tubeless tire construction. This was an air-sealing tire liner which "has a wall of resilient stretchable flexible sheet material and consists of butyl-type rubber having a low rate of diffusion of air for retaining the air in the tire." The liner covers the entire inner surface of the tire and the bead portion thereof, extending to the top of the rim flanges. One suggested modification was "a plurality of circumferential ribs * * * at the rim engaging face to provide an improved air seal between the tire and the rim. These ribs * * * are *preferably of resilient rubber material such as the butyl-type rubber of the liner * * molded integrally with*" the rim flange face of the liner.[57]

Tires manufactured by Goodyear with butyl liners under the Wingfoot teachings had test wheel operations of 8,389, 8,798, 7,144 and 14,767 miles, and passenger car operation of 10,214 and 9,114 miles.[58]

Ante litem motam, plaintiff did not disparage the Wingfoot patents and applications as its expert did on the trial. In a letter dated February 5, 1951, from patent counsel to the president of plaintiff, the following appears:

"In 1943 a patent application was filed in this country and about a dozen foreign countries, by The Goodyear Tire & Rubber Co. on a tubeless tire with a butyl lining and bead-sealing ridges on the outside of the beads. *Its mechanical construction differs from that of our commercial tubeless tire in not having the puncture-sealant.* For some reason we have not been able to learn, Goodyear dropped all the patent applications on this tubeless tire."

The only stated distinction then attempted by plaintiff's patent counsel between Wingfoot and plaintiff's "commercial tubeless tire" [59] was the absence of a "puncture-sealant"—a feature not involved in this litigation. *Especially significant is the failure to refer to any distinction because of the use of butyl ribs by Wingfoot.*

Plaintiff's expert on this trial admitted that "if the Wingfoot patent had used the Herzegh materials, they would get the same kind of results."

Apparently Goodyear dropped all its Wingfoot patents or applications because of advice contained in a letter of March 7, 1944 from its patent department [60] in

---

56. "The Compounding and Processing of Butyl Rubber" by I. E. Lightbown; The Rubber Age, Vol. 51, August, 1942, pp. 377–380.

57. The same attorney in plaintiff's patent department appears on the Herzegh and Perkins applications.

58. Plaintiff's expert claimed that this was

"an easy test" as the tires were oversize on the test car.

59. Presumably under the Herzegh patent, although as shown (supra) plaintiff's tire had in 1951 materially departed from the Herzegh teachings.

60. Goodyear made available to plaintiff and defendant files of its work on tubeless tires.

connection with its United States application: [61]

"British Patent 329,955 [Killen] has been cited in this case. In our opinion, this reference is a complete anticipation of the present invention.

\* \* \* \* \*

"It is our recommendation that this application be abandoned."

Presumptions of Validity.

Plaintiff relies upon various "presumptions of validity" and especially those claimed to arise (1) from the issuance of the patent; (2) from alleged commercial success; (3) from alleged copying; and (4) from prior unsuccessful efforts by defendant and others to develop the alleged invention.[61a]

1. Presumption of validity of patent from its issuance.

■ United States Code, Title 35, § 282 provides that:

"A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it."

This burden has been said to be "a heavy one, as it has been held that 'every reasonable doubt should be resolved against \* \* \*.'" the party asserting invalidity. Mumm v. Jacob E. Decker, 1937, 301 U.S. 168, 171, 57 S.Ct. 675, 676, 81 L.Ed. 983.

The weight to be given any such presumption is, however, dependent among other things upon the nature of the prosecution in the Patent Office. In this instance, the Examiner, although listing nine American and three foreign references in the Herzegh file wrapper, did not cite two patents more pertinent than any of the cited references; such patents and their importance were known to plaintiff's patent counsel; and an affidavit of Herzegh intended to establish priority over two of the Patent Office citations, and to prove satisfactory tests, was at best misleading.

a. *Failure of Patent Office to Cite Best Prior Art.*

■ Neither Killen nor the South African Wingfoot patent was referred to of record in the prosecution of the Herzegh patent. In some cases, it may be "as reasonable to conclude that a prior art patent not cited was considered and cast aside because not pertinent, as to conclude that it was inadvertently overlooked." Artmoore Co. v. Dayless Mfg. Co., 7 Cir., 1953, 208 F.2d 1, 4, certiorari denied 1954, 347 U.S. 920, 74 S.Ct. 518, 98 L.Ed. 1075.

On the other hand, as stated by the Fourth Circuit in Gillette Safety Razor Co. v. Cliff Weil Cigar Co., Inc., 1939, 107 F.2d 105, 107:

"Neither of these earlier patents were cited by the Patent Office when the O'Malley application was pending, and since they unquestionably constitute a most important part of the prior art, the presumption of validity arising from the grant of the patent is greatly weakened. Maibohm v. R. C. A. Victor Co., 4 Cir., 89 F.2d 317."

The prior art cited by the Patent Office was:

Savage [62]—an uninterrupted tire with rubber tube vulcanized therein, for mounting on a flat-based or clencher rim, with or without a removable rim flange. In one illustration the tire when inflated is held on the flat-based rim by pressure of the sidewall covering of the bead against the rim flange.

---

61. Application filed July 21, 1943. The specifications and claims in this application are, with a few immaterial variations, verbatim those of the South African patent 463/44.

The drawings are identical.

References made of record in the United States application were:

| | | | |
|---|---|---|---|
| Conigrave | 1,842,315 | Jan. 19, 1932 | 152–330—ORZ |
| Bull | 1,996,580 | July 17, 1934 | 152–330—ORZ |
| Killen (Br.) | 329,955 | of 1930 | 152–330—ORZ |

(3 sheets dwg, sheet 1 cited; 8 pp. spec. page 15 cited)

| | | | |
|---|---|---|---|
| Duval (Fr.) | 345,879 | of 1904 | 152–330—ORZ |

(1 sht. dwg; 2 pp. spec.)

61a. The fourth ground has been dealt with in the earlier part of the opinion.

62. No. 1,443,652. Application October 12, 1918, patented January 30, 1923. "Pneumatic Tire."

Wait [63]—the object of the invention was to provide a method of tire construction to replace the usual chafer strips, by a rubber strip "completely around the bead or to the bottom and outer side", with projections in the mold, forming, for example, circumferential ribs.

Day [64]—relates entirely to venting air which may escape from an inner tube, to avoid air permeation of the carcass cords, forming "blisters in the rubber of the sidewalls and tread * * *."

Becker [65]—a valve stem for inner tubes to prevent tears and leakage. Preferably the interior surface of the tube is treated with a composition "that seals the pores in the rubber of the tube and prevents the seepage of air therethrough."

McMahan [66]—states that "it has recently been suggested that tubeless tires be employed and particularly where the space between the tire and rim is to be completely filled with water. Considerable difficulty has been experienced in mounting the tubeless tires on the rim of a vehicle." The interior of the tire is coated with a "gum coat" which is a substantially pure coating of rubber which may be applied as a cement dissolved in solvent, or it may be calendered on to the tire during manufacture. "This coat makes the tire water impervious."

The beads of the tire are spread wider apart than in the conventional tire and special means for venting air are mentioned. Billingsley, plaintiff's expert, testified that under ordinary circumstances a tire filled with air would function in a very similar manner to one filled with water; the McMahan tire would work and hold inflation for at least a limited period of time; "days or weeks" but not as long as the Herzegh tire.

The illustration shows the conventional drop center rim, which performs the function of containing air or water pressure.

McMahan does not show any ribs to form a seal against the rim flange.

Thomas, et al.[67]—Formulae for butyl rubber.

Lightbown, et al.[68]—A composition or mixture of the active constituents of butyl, natural rubber and/or GR-S to be bonded, forming a tie-gum by which such rubber-like bodies can be bonded by simultaneous vulcanization.

Young [69]—While Fig. 1 shows a separate seal on the base of the rim connecting the heavy liner on each side, Fig. 2 shows a mounting on the conventional drop center rim and is interesting because the contact with the rim flange is by "appropriately thinned *side walls*" of the customary rubber used on the customarily fabricated carcass or foundation. In Fig. 2 the rim acts as part of the air container.

Busse [70]—process for the "tackification and plasticization of synthetic rubbers * * *."

### Foreign Citations.

Nordisk (Danish) [71]—prevention of

63. No. 1,915,963. Application September 30, 1930, patented June 27, 1933. "Method of Tire Construction."

64. No. 2,007,825. Application September 4, 1931, patented July 9, 1935. "Vented Rubber Article."

65. No. 2,255,146. Application October 11, 1933, patented September 9, 1941. "Valve Stem for Inner Tubes."

66. No. 2,331,795. Application December 18, 1940, patented October 12, 1943. "Tire." The patent was assigned to Wingfoot Corp., a subsidiary of Goodyear.

67. No. 2,356,128. Application October 20, 1939, patented August 22, 1944. "Mixed Olefinic Polymerization Process and Product."

68. No. 2,467,322. Application December 7, 1940, patented April 12, 1949. "Tie-Gum for Polymer-Rubber Articles."

69. No. 2,489,995. Application November 27, 1944, patented November 29, 1949. "Puncture-Proof Self-sealing Pneumatic Tire."

70. No. 2,522,776. Application October 11, 1946, patented September 19, 1950. "Process of Rendering Synthetic Rubber Tacky."

71. Danish Patent No. 42198. Issued April

penetration of moisture and dust between the edge of the rim and the casing "by providing the casing with projecting sealing and reinforcing ribs which are placed on each side parallel with and a suitable distance from the edges of the casing in such a way that one or more of the reinforcing ribs will lie against the edges of the rim after mounting of the casing. These ribs will take the wear caused by the edges of the rim as the result of vibration of the casing during running, and will be pressed by the inflated innertube against the edges of the rim and cause the casing to seal tightly against them so that water and dust cannot penetrate and cause destruction." The sealing and reinforcing ribs are preferably made of rubber, as is the casing and they may suitably be made integral with the rest of the casing.

Duval et al. (French).[72] The invention relates to a pneumatic tire without an inner tube. On a rim generally of the "clencher" type is mounted a tire with an ordinary casing but with a covering of pure rubber covering the interior of the tire and extending around the beads, which in the illustration have external elongations to fit the rim grooves, "in such manner as to cover the whole surface of the latter in contact with the grooves of the rim." In the bottom of the rim between the beads is a ring with trapezoidal or wedge-shaped sides. By tightening on threaded studs, the beads of the tire are laterally compressed in the grooves of the rim.

Lacomblez (British).[73] The application related to a method "for preventing the deflation of inner tubes of pneumatic tires * * * as a consequence of the penetration of nails or other like objects." A band of spongy rubber is cemented on the inside or outside of the inner tube

for a distance corresponding to the tread surface.

b. *Prosecution of Herzegh Patent in Patent Office.*

As filed December 14, 1946, the Herzegh application contained one sheet of drawings which was carried through without change into the patent as issued. The specification likewise remained unchanged, except for additions (on September 29, 1949) in two places, of references to adhesive qualities of the puncture sealing material.[74]

Fifteen claims were filed in the original application. The first ten related exclusively to the bead sealing ribs, which ribs were described as being of "resilient rubber-like material" (Claims 1–9), or "resilient material" (Claim 10). Claim 11 related to a tire "having an inner lining adhered thereto of material of less permeability to air than the material of the tire outwardly thereof", and sealing ribs of resilient rubber-like material. Claim 12 related to a butyl type inner lining, and "air-sealing means at said bead portions." Claim 13 related to a butyl liner and resilient rubber-like sealing ribs; Claim 14 to a tire with butyl type rubber composition united with the body integrally at the inner face; and Claim 15, to a tire with butyl type rubber composition constituting a part of the body.

On October 30, 1947, the examiner rejected all claims in language so terse and significant that it is worthy of quotation in full:

"Claims 1–7 inclusive and 10 are rejected as clearly fully met by Wait.

"Claim 8 is rejected on Savage in view of Wait. No invention is seen in applying the circumferentially continuous rim engaging ribs of

29, 1930; protected from April 5, 1929. "A Casing for Bicycle and Automobile Tires."

72. French Patent No. 345,879. Filed August 26, 1904; granted November 2, 1904; published December 20, 1904. "Road Transport—Vehicles—Pneumatic Tire."

73. British Patent Specification No. 439,869. Application March 12, 1934. "Improvements in and relating to Pneumatic Tyres." The specification was not accepted, the application became void; the specification as filed became open for public inspection on September 12, 1934.

74. Found in the patent as issued in Col. 5, 1s. 17–19 and 1s. 33–38.

Wait to the pneumatic tire shown by Savage Figure 1.

"Claims 9 and 11 are rejected on Wait in view of Becker. No invention is seen in applying the impervious lining 28 of Becker to the Wait tire.

"Claims 12 and 13 are rejected on Wait in view of McMahan. *No invention is seen in substituting a butyl type rubber in lieu of the gum coat* 4 of McMahan on the interior of the Wait tire. The physical properties of butyl rubber are well known and no unexpected phenomenon occurs when a tire is lined on its internal side with a coating of butyl.

"Claims 14 and 15 are rejected as unpatentable over McMahan. No invention is seen in substituting butyl for another type of rubber for reasons stated in action on claims 12 and 13 supra.

"Claims 9, 11, 12 and 13 are rejected as reciting the specific inner layer in aggregation with the specific plurality of circumferentially continuous ribs. *It is not seen wherein the specific features of either contribute to any purpose or result jointly or in common with the specific features of the other. Either device could be used with a conventional form of the other, and would function in the same manner and produce the same result when so used.*"

On April 28, 1948, plaintiff filed a response to this Patent Office action. Various changes in the description of the physical aspects and location of the ribs were made by amendment, and Claims 1, 2, 5, 9 and 10 were cancelled. The "Remarks" accompanying the amendments refer repeatedly to the "commercially successful tubeless tire" disclosed by the application. The "association" of the lining and the bead sealing as a

"composite structure that are truly related and interdependent in a patentable sense" is urged. The summation refers to "a composite, integral tire body including a lining adhered at its inner face, which lining is [75] of butyl type rubber * * *."

Prior thereto, and at least by April 14, 1948, plaintiff had learned of the Killen patent, for on that date Gray wrote to Billingsley, with copy to Herzegh, in part as follows:

"I am advised that there is a British patent on tubeless tires which calls for a lining on the inside of the tire to hold the air and for sealing ridges molded into the portion of the bead which contacts the rim flange. Obviously, such a patent may cause us considerable trouble as far as getting coverage is concerned.

"The mere fact that such a patent exists, however, does not mean that the inventor developed a practical tire. We know that crude rubber, unless in extreme cases, is not satisfactory for use as a lining. At the time the British patent was issued, butyl was not available."

On June 8, 1948, and before any action had been taken by the Patent Office on plaintiff's April 28, 1948 amendments, plaintiff filed a supplemental amendment embodying six new claims. These all referred for the first time to the shape of the tire. Some of these are specifically descriptive of the then and now conventionally shaped tire. All are different from the squat shape of the Killen tire. Four include a puncture-sealing layer of plastic adherent rubber-like material at the crown region.[76]

The Examiner added as references the Duval (French), Nordisk (Denmark) and Lacomblez (British) patents, and rejected all claims on March 31, 1949. He pointed out that Duval and McMahan dis-

---

75. Not simply, or as in the specification, that butyl type rubbers "are found to be well suited" (patent, Col. 4, l. 55).

76. Defendant plausibly suggests these amendments were made in view of plaintiff's knowledge of Killen, and as a possible "hedge" if the Examiner cited that patent.

close tubeless tires coated with rubber; Thomas disclosed butyl rubber which has well known characteristics, including imperviousness to air; "[N]o invention would be involved in supplying a layer of butyl in lieu of the Duval or McMahan rubber or rubber-like inner layers"; Lacomblez disclosed the puncture seal; and Nordisk discloses the bead seal structure claimed. As to aggregation, the Examiner said:

> " * * * it is believed that the bead seal operated independently of the butyl inner liner and since each element would perform no different function in the absence of the other,[77] the rejection on the ground of aggregation is proper."

At least as early as February 23, 1949 plaintiff had a copy of the Goodyear (Wingfoot) Australian [78] patent application. This was then characterized as a "tubeless tire with a butyl rubber lining and sealing ribs molded on the beads."

On September 29, 1949, plaintiff filed another amendment. This added references to puncture-sealants to all filed claims not calling for such sealant, and the liner reference was amended to describe it as "butyl type" where that did not appear in the then filed claims.

The great emphasis in the "Remarks" accompanying the amendments was upon the specification of the puncture sealing layer adhesively compatible with the liner.

Claims 3, 4, 6, 7, 8 and 11 were cancelled.

The Examiner added Lightbown et al., Busse and Young as references, and rejected all claims.

After this third rejection, plaintiff's patent counsel on February 5, 1951, made a report to plaintiff's president on the "Tubeless Tire Patent Situation." As to plaintiff's own patents, he said, in part:

"The principal case is the Herzegh patent application claiming a tubeless tire with bead-sealing ridges, a butyl [79] liner, and a puncture sealant. Since the 1930 Killen patent shows bead-sealing ridges and a puncture sealant, and since the 1943 Goodyear application shows bead-sealing ridges and a butyl liner, we have not yet been able to convince the U. S. patent examiners that a patent should be granted * * *." [80]

It was suggested that new patent counsel be associated in the prosecution of the patent, and this was done.

On March 9, 1951, new counsel wrote plaintiff's house counsel with respect to the prosecution of the Herzegh application. He disagreed with the Examiner's application of the Young and Busse patents, but pointed out that as their filing dates were November 27, 1944 and October 11, 1946, respectively, they might be overcome by an affidavit showing reduction to practice by Herzegh prior thereto. He also suggested inclusion in the affidavit of allegations concerning Herzegh's own efforts, and reports of tests by the A. A. A.

New counsel recommended an interview with the Examiner prior to the filing of a response to the outstanding rejection. The principal purpose would be "to impress the Examiner with the commercial importance of the Herzegh invention"; to criticize the Examiner's reliance on Lightbown and Duval; and to point out Herzegh's priority over Young and Busse. On March 27, 1951, counsel reported that he had arranged an interview with an Examiner (who was not the Examiner who had made the three rejections), for April 3 or 4.

There is no direct evidence that such conference was held, although defendant

---

77. Herzegh so testified and his counsel so admitted (infra).

78. Similar to the South African patent, heretofore discussed.

79. Note the flat use of the word "butyl".

80. This is slightly disingenuous. The Examiner had rejected all claims on the basis of twelve prior art citations and had not of record relied on Killen or Wingfoot, the only citations of plaintiff's patent counsel.

argued, without objection or contradiction, that it was; and plaintiff's brief twice refers to such an interview in a manner not disputing its occurrence.

In 1951, Practice Rule 133 of the Patent Office provided, as to interviews, that:

"(b) In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant * * *."

No written statement of this nature is in the file wrapper.

On April 4, 1951, an amendment was filed, adding what appear as Claims 11–20 of the patent. This was followed by eight pages of remarks.

Emphasis was placed upon the alleged success of the invention "borne out" by the Herzegh affidavit; "successful performance of the tire in tests under the surveillance of the American Automobile Association and in the public acceptance which warranted the production to date of over one-half million tubeless tires built in accordance with and embodying applicant's invention." It was also specifically claimed that the attached affidavits of Herzegh and another "show completion of the invention prior to November of 1944 by the building of tires having a lining of butyl-type rubber and a puncture sealing layer of plastic adherent butyl-type rubber composition and the successful operation of these tires all prior to November 1944", thus antedating Busse and Young.

Counsel in the Remarks made the following rather equivocal argument that "It is quite plain from an examination of the claims now in the case and a study of the cited patents that *no one patent shows the complete subject-matter* of any one of these claims."

This tends to point up the significance of Killen and Wingfoot. The Examiner had referred to patents showing a natural rubber liner, which could be replaced by butyl, without amounting to invention; and to patents involving sealing ribs. But Killen and Wingfoot each taught both a lining and ribs.

Herzegh in his affidavit attached to the April 4, 1951 amendments and Remarks states that before November 1944 the invention [81] was completed "by the building of tires as defined in said claims and the testing of them on vehicles in actual road service * * *." He swore that his recollection was confirmed by certain records of tests, primarily related to "Heat Build-up" in which performance by a standard tire was compared with that of one which was modified by the inclusion of "a lining layer on the inside face thereof of Butyl type rubber composition designated in the report as 147SX63, and by the inclusion also of a puncture sealing layer in the crown of the tire of butyl type rubber composition designated in the report as ½ 147SX54 and ½ 147SX63"; that this was mounted on a split type rim, and sealing at the beads was effected by an Air Seal Bead Lock.[82] Numerous other tires "were constructed in accordance with said invention and road tested."

The affidavit further states that tires with "a lining and puncture sealing layer of butyl type rubber composition in accordance with the invention" were built, but "sealing at the beads was effected by circumferential ribs extending outwardly from the axially outermost faces of the bead portions" on one-piece drop-center rims. Herzegh's recollection was "confirmed" by a drawing of a "Rim Seal Gasket Mold" made for "the purpose of molding rings with sealing ribs for incorporation on the outer faces of the tire

81. "Set forth for example in claims 12, 14, 15, and 21 of said application." These became claims 1, 3, 4 and 10 of the patent.

It is extremely significant that the affidavit does not state whether the tires allegedly so built and tested were the ones "as defined" in the claims as originally filed, or in what stage of the various amendments.

82. Bearing no resemblance to the sealing ribs" of the patent.

bead portions"[83] prior to November 1944; and that these were successfully operated.

The affidavit also stated that in the tubeless tire "of his invention" damage to the sidewall led to a slow leak rather than a sudden blow-out; and that this advantage and also the puncture sealing features had been confirmed by tests independently supervised by the American Automobile Association.

In fact, the "Heat Build-up" sheet, filed with the affidavit, does *not* show "a lining layer * * * of butyl type rubber composition designated in the report as 147SX63", but only "P.P." (puncture-proof) "liner ½ 147SX54 ½ 147SX63." When confronted with this, Herzegh testified on cross-examination that these two, and the only two, compounds mentioned on the memorandum, were in fact the puncture-sealing element. "The lining element actually was 147SX63." On questioning by the court, Herzegh admitted that there was nothing "visibly" in the report itself (which was supposed to have "confirmed" his recollection) which "designated" or referred to a liner—whether of 147SX63 or of any other composition; that it would be a "very reasonable assumption" that the exhibit would be construed "to mean that the puncture-proof liner was a mixture of the" two stated stocks, if the exhibit had been read "by someone [84] not familiar with what I actually did." [85] This was a dual element, puncture-sealing material, which was not new, because puncture-sealing inner tubes of similar construction were being made.

Both 147SX54 and 147SX63 are more like the sealing formula in the Herzegh patent than the lining formula set forth therein.

Further, cross-examination developed that the "Rim Seal Gasket Mold" which was stated in the affidavit to have "confirmed" Herzegh's recollection, produced in effect a "washer" with a very large hole in the center. These washers were cemented to the bead. Four tires so constructed were mounted on Herzegh's automobile, on October 9, 1944, and removed October 18, 1944, because of air loss and chafing, and were replaced with tires having an Air Seal Bead Lock. These were the only ones as to which any written record was offered. Herzegh however testified that other tires with such seal did operate successfully.

Herzegh further testified that the tires which were the subject of the A. A. A. tests, reports of which were filed with the affidavit in the Patent Office, and were therein referred to as the "tubeless tires of his invention," in fact did not use the patent recipe for either the lining or sealing elements.

Herzegh further testified that he seldom read affidavits in patent cases before he signed them; "I don't read them in the sense that I understand exactly what they mean. I glance at them." That practice was followed with respect to the affidavit in this case.

On January 18, 1952, notice of allowance of the patent was mailed.

Under the foregoing circumstances, the presumption of validity from the mere issuance of the patent becomes "relatively" fully permeable.

2. Alleged commercial success.

■ It is well established in this Circuit that "commercial success is a factor of probative value on the question, in close cases, whether a patent actually involves novelty and invention." Hutzler Bros. v. Sales Affiliates, 4 Cir., 1947, 164 F.2d 260, 267; Florence-Mayo Nuway Co. v. Hardy, 4 Cir., 1948, 168 F.2d 778, 781. But such commercial success must relate to and be attributable to the invention.

---

83. Note the absence of any description of the material of which these ribs were to be composed.

84. Such as the Patent Office Examiner; or the court.

85. The court's marginal comment on its notes of this testimony made while the witness was testifying was: "a bit fishy". A review of the testimony leads to no change in this piscatorial appraisal.

Kromer v. Riegel Textile Corporation, 7 Cir., 1955, 227 F.2d 741, 743; Foxboro Co. v. Taylor Instrument Companies, 2 Cir., 1946, 157 F.2d 226, 233.

Here it is sufficient merely to mention a few of the factors which negate commercial success attributable to the merit of the original device alone.

(1) To and including the calendar quarter ending June 30, 1954, plaintiff's advertising costs in the promotion of tubeless tires was over $9,400,000. During that period, 2,604,154 tubeless tires were sold. This averaged $3.64 of advertising per tubeless tire.[86] For the years 1948, 1949 and 1950, the average was $0.19 per conventional tire.

Even in the absence of affirmative evidence of such extended advertising, this Circuit has recognized that advertising is often at least as effective as intrinsic merit in the introduction of a product into the market. National Mach. Corp., Inc., v. Benthall Mach. Co., Inc., 4 Cir., 1916, 241 F. 72, 88. To the same effect is Tropic-Aire, Inc., v. Sears, Roebuck & Co., 8 Cir., 1930, 44 F.2d 580, 593, certiorari denied 1931, 282 U.S. 904, 51 S.Ct. 217, 75 L.Ed. 796.

(2) In announcing its tubeless tire and at least in the early advertising, samples of which appear in the file wrapper,[87] the emphasis was upon the puncture-sealing feature[88] and the non-skid tread. It was not until it was known that Firestone was preparing to offer the new car

manufacturers tubeless tires without sealant, that plaintiff really entered into this field.

(3) The tires built according to the specifications of a lining of the material and location set forth in the patent were not commercially successful. Adjustments were made on over 23% of the tires. Plaintiff then went through a series of experimentation and departures, never returning to the first production tires. It was after the nature and extent of the original liner, and the nature of the rib material had been changed, that plaintiff developed a commercially successful tire.

3. Alleged copying by defendant.

Plaintiff claims that the presumption of validity is further buttressed when defendant "gives the tribute of its praise to the prior art" but gives to the patent "the tribute of its imitation"; Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 1911, 220 U.S. 428, 441, 31 S.Ct. 444, 55 L.Ed. 527; Ackermans v. General Motors Corp., 4 Cir., 202 F.2d 642; Florence-Mayo Nuway Co. v. Hardy, 4 Cir., 1948, 168 F.2d 778, 782. But, as said by the court in Auto Specialties Mfg. Co. v. Handler Motor Supply Co., 8 Cir., 1955, 226 F.2d 853, 855:

"We also think it is not without significance that the plaintiff in this action soon departed in its manufac-

86. Plaintiff's expert testified that much of the advertising was not related to the tubeless feature.

87. One of the advertisements contains a cut of a combat truck, and the legend: "1942. B. F. Goodrich Develops Tubeless Tire. During World War II, B. F. Goodrich applied the tubeless principle to combat tires. B F G scientists later applied *this tubeless principle* to tires for automobiles."
These combat tires had a heavy lining of one-quarter inch to one inch or more, of ordinary rubber. In his effort to make tubeless combat tires, Herzegh developed his air seal bead lock, which was tightly clamped between the toes of the tire; the seal being effected entirely mechanically, not by inflation. Herzegh tes-

tified that this combat tire construction would not be suitable for use on passenger cars; the tires would generate extreme heat, and the thickness of the walls would cause hard riding.

88. That the plaintiff did not believe that commercial success could be attained on the alleged merits of the tubeless nature of tires is made abundantly clear by plaintiff's inter-office memorandum of October 4, 1951:
" * * * As originally discussed with members of the Sales Department, it was felt that such a [tubeless] tire would have nothing to offer as far as customer appeal was concerned.
"The tire was then redeveloped adding the sealing feature * * *"

ture from the teaching of its patent in suit * * *."

A comparison between plaintiff's patent and defendant's tires will be made under the section of this opinion dealing with infringement. Suffice it at this point to say that if there be a "tribute of imitation", it was not a tribute paid to plaintiff's original construction, which followed literally the teachings of the Herzegh patent.

Perhaps plaintiff's own treatment of its original product, and its many and material departures therefrom, might be characterized as the self-deprecation, or condemnation, of departure.[89]

### Conclusions as to Novelty and Patentability.

#### Indefiniteness of Claims.

In addition to the broad question of novelty and patentability in view of the prior art, defendant strenuously contends that the claims are void for indefiniteness. All claims in suit except claim 20 refer to "a relatively thin lining." The question immediately suggests itself: "Relative to what?" Nowhere in the patent is there any delimitation, unless it be found in the language (Col. 4, l. 74—Col. 5, l. 1), "in a thickness of the lining layer 25 of the order of .04 inch and even lower, depending on the type of service * * *."

The indefiniteness of even this language is clearly demonstrated by the difficulty it occasioned the special counsel brought in by plaintiff in 1951 to assist in the Patent Office prosecution. On March 9, 1951, he wrote the plaintiff with respect to this question that the application:

"would clearly support claims to a 'relatively thin' lining layer, or one having a thickness 'of the order of .04 inch'. Unfortunately, however, the specification clearly implies that the latter dimension is an approximate upper limit (but with no lower limit given), whereas it is my understanding that in practice the butyl liner may have a thickness of several times this figure. I would therefore anticipate considerable difficulty in obtaining claims directed to the thickness of the butyl lining which would be both broad enough to cover the range of thicknesses practically useable and also properly supportable by the disclosure, and still not be subject to rejection on the ground of indefiniteness."

Counsel's understanding that plaintiff's liner exceeded .04 inches is correct. This is also true as to defendant's liner.

The court had suggested that as the liner is to replace an inner tube, the patent might have intended to compare the thickness of the liner with that of an inner tube. Data furnished in response to this suggestion established that the thickness of an inflated butyl rubber inner tube was about .044 inches, which is "relatively" in the order of the only given liner dimension of .04 inch.

The claims for a lining of "substantially impervious butyl type rubber composition" or "substantially impervious material" again raise questions of relativity.[90] The specification casts no additional light, since it (col. 4, ls. 41–42) uses the term "relatively impermeable material." The question is one of substance, since the liner presently used (and used since at least March 1953) by plaintiff, has a "relative impermeability" of 60–65% that of the liner of all new butyl rubber first used by plaintiff, and given as the only liner recipe in the specification.

As to the sealing ribs, claims 11, 12 and 19 call for their construction of sidewall material; claims 13 and 20 call for their construction of resilient rubber material. The specification (Col. 3, ls. 54–56), refers to ribs "of resilient rubber or other rubber-like material." Butyl rubber for the ribs is not in terms excluded, for

89. Cf. Kay Patents Corp. v. Martin Supply Co., Inc., D.C.D.Md.1952, 105 F. Supp. 442, 450, affirmed 4 Cir., 1953, 202 F.2d 47; Sinclair & Carroll Co., Inc. v. Interchemical Corp., 1945, 325 U. S. 327, 334, 65 S.Ct. 1143, 89 L.Ed. 1644.

90. See footnote 17, supra.

the specification (Col. 4, ls. 64–66) with reference to the butyl liner says that "such butyl type rubber exhibits good properties of flexibility and resilience." Butyl is admittedly a "rubber-like material."

Moreover, the sidewalls of plaintiff's tubeless tires, composed of natural rubber in the early production period, have at varying times from October 1952, been, and currently are, of synthetic rubber (GR-S).

The necessity for clarity and distinctness, both from the standpoint of novelty and invention, and infringement, has frequently been stated by the courts.

In United Carbon Co. v. Binney & Smith Co., 1942, 317 U.S. 228, 236, 63 S. Ct. 165, 170, 87 L.Ed. 232, the court said:

"The statutory requirement of particularity and distinctness in claims is met only when they clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise. A zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims would discourage invention only a little less than unequivocal foreclosure of the field. Moreover, the claims must be reasonably clear-cut to enable courts to determine whether novelty and invention are genuine. Congress has provided that a patent may be awarded only for a new and useful manufacture 'not patented or described in any printed publication in this or any foreign country, before his invention or discovery thereof.' R.S. § 4886, 35 U.S.C. § 31, 35 U.S. C.A. § 31. While we do not find it necessary to consider questions of novelty and invention, in the view we take of the claims in suit, a mere reading of prior art patents shows how, if they are read with the liberality and inclusiveness claimed for those in suit, they describe products, if not identical, at least of confusing similarity. Whether the vagueness of the claim has its source in the language employed or in the somewhat indeterminate character of the advance claimed to have been made in the art is not material. An invention must be capable of accurate definition, and it must be accurately defined, to be patentable."

Likewise, the Fourth Circuit said, in Todd v. Sears, Roebuck & Co., 4 Cir., 1954, 216 F.2d 594, 596:

"Todd's counsel rely heavily upon the first element of the patent, the pivotal connection of the forward end of the draw bar to the tractor frame at a point substantially one-half of the distance between the front end of the tractor frame and the axles of the tractor. The word 'substantially' here is not happy; it is quite vague and indefinite. Evidently, Todd claims a wide range under this word, for he claims the accused device is within the patent, when the hitch point is approximately 59% of the distance in question. And Todd testified that he would rather not state whether 40% or 60% or 75% or 80% would be within the patent. Certainly the use of this word in patent claims has not met with favor at the hands of the federal courts. United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 236, 63 S.Ct. 165, 87 L.Ed. 232; General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 369, 373, 58 S. Ct. 899, 82 L.Ed. 1402; Barkeij v. Lockheed Aircraft Corporation, 9 Cir., 210 F.2d 1, 2; General Motors Corporation v. Estate Stove Co., 6 Cir., 201 F.2d 645, 646; Steel Wheel [Corp.] v. B. F. Goodrich Rubber Co., 6 Cir. [D.C.], 27 F.2d 427. Nor is the meaning of this term made clear by the specifications of the patent.

"The Todd designation of the hitch point is open to the further objection that it is a mere matter of degree rather than substance."

See also, In re Jennings, 1943, 133 F.2d 906, 909, 30 C.C.P.A., Patents, 887.

The court finds as a fact, and concludes as a matter of law, that the claims in suit [Claims 11, 12, 13, 19 and 20], are unpatentable for indefiniteness. The point, however, is a "relatively" fine one, and the court desires primarily to rest its decision on the broader substantive grounds immediately following.

### Butyl-type Rubber Liner.

The prior art, cited by the Patent Office Examiner, and Killen, not cited, showed tubeless tire linings of natural rubber, which was all that was then available. The Wingfoot patents, also not cited by the Examiner, showed butyl liners.

Herzegh blamed the failures of the early tubeless tire on the lack of a satisfactory diffusion barrier, and recognized that his own claimed success was due to the invention by others of butyl rubber. In 1949, in a talk delivered by Herzegh on "Puncture Sealing Tubeless Tire", he said:

"However, there was an even more important reason that these early proposals were doomed to failure which was probably not realized at that time. The cord body of a tire is relatively like a sieve as compared with the more impervious sidewall and tread. When the interior of a conventional tire is inflated without a tube the air diffuses through the cord body and creates pressure against the tread and sidewall. This pressure combined with the heat and stress caused by flexing results in blisters or separation of the sidewall or tread from the cord body. When this action was probably observed at some later time, rubber linings were used on the inside of the tire to retard the diffusion of air into the cord body of the tire. The rubber linings which were approximately equal in thickness to inner tubes were not an adequate remedy.

\* \* \* \* \* \*

"It was necessary to find a flexible material with suitable adhesion to rubber or cord and more impervious to air than was rubber so that the lining would be light enough to be practical. Many different materials were tried but many of them were not satisfactory in preventing air diffusion into the tire body or they were too brittle and would crack and flake. *A new rubber was announced which was not a product of Malaya or Sumatra, but was a product of our American chemical ingenuity. This material is known today as Butyl rubber and it has the remarkable physical property of being at least 10 times better than natural rubber for retaining air.* \* \* \*"

The cases have consistently held that there is no invention in the substitution of an improved material when it subsequently becomes available. Peculiarly applicable is the decision in Sinclair & Carroll Co., Inc. v. Interchemical Corporation, 1945, 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644. The prior art had proposed various solvents for use in making a heat-drying ink to prevent offsets when printing was done on glazed surfaces. Shortly after butyl carbitol came on the market as a commercial solvent, and its properties had been publicized, Interchemical obtained a patent for a heat-drying ink containing butyl carbitol as the solvent. The new ink with the new solvent was a definite improvement over inks using earlier solvents. Nevertheless, the Supreme Court held that this was not invention, saying, 327 U.S. at page 334, 65 S.Ct. at page 1147:

"Gessler's solvent [butyl carbitol] is undoubtedly more satisfactory than any of the solvents mentioned in these patents, but it must be remembered that all but one of these patents were granted before butyl carbitol appeared on the market. The fact is that Gessler himself to a large extent has abandoned butyl carbitol and now uses a narrow cut of petroleum. Even assuming that if Gessler had discovered the com-

pound he would be entitled to a patent, he did not discover it. Reading a list and selecting a known compound to meet known requirements is no more ingenious than selecting the last piece to put into the last opening in a jig-saw puzzle. It is not invention."

Similarly, the Fourth Circuit, in Pollard v. American Phenolic Corporation, 4 Cir., 1955, 219 F.2d 360, at page 363, reversed a holding of validity and infringement, saying:

"It is well settled that the substitution of a modern material for other material does not amount to invention. United States Appliance Corp. v. Beauty Shop Supply Co., 9 Cir., 121 F.2d 149; Martin v. Wyeth, Inc., 4 Cir., 193 F.2d 58. See, also, Doughnut Machine Corp. v. Joe-Lowe Corp., 4 Cir., 67 F.2d 135."

Again, in Goldman v. Polan, 4 Cir., 1938, 93 F.2d 797, at page 799, the court said·

"It is perfectly clear that all that plaintiff did was to use a material, superior for the purpose which he had in mind, in place of the fabric customarily used for covering umbrellas. Or, to look at the matter from another angle, he merely applied the oiled silk developed by another person to a new use but one analogous to the uses theretofore made of it. If the use of the oiled silk with the umbrella frame be conceived of as a combination, the answer to the claim of invention is that no new result was attained which was the joint product of the combination, but each of the old elements worked out the old results in the old way. The oiled silk offered the same resistance to water on the umbrella that it would have offered as a cape; and the umbrella frame supported it in the same way that it would have supported any other covering. If plaintiff could obtain a patent on the use of the fabric as a covering for umbrellas, we perceive no reason why he could not have had patents covering its use for shower bath curtains, or capes; and any new fabric, on this principle, whether patentable or not, would be subject to as many different patents as uses could be found for it."

A good general statement of the law is also found in Evr-Klean Seat Pad Co. v. Firestone Tire & Rubber Co., 8 Cir., 1941, 118 F.2d 600, 602:

"There is, of course, no invention in simply substituting one material for another in a manufactured product, in order to obtain the benefit therein of some of its known, superior qualities or characteristics. [Citations omitted.] Though the particular use be new and the utility of the product be greatly enhanced thereby, there is no patentability involved so long as it constitutes only an extended application of the obvious attributes of the material. [Citations omitted.] For a substitution of materials to constitute the basis for a patent, the use sought to be protected must be one, not of analogous extension, but of discovered novelty, or it must rest upon some real originality in the method of applying the material to such use. [Citation omitted.] The fact that a practical difficulty is presented and solved, in adapting the material to the desired use, does not give rise to patentability, if the method of adaption is such as would obviously suggest itself to those skilled in the art, when confronted with the task of making the substitution. [Citations omitted.] The patent law was not intended as a dam to divert natural changes and evolutionary progress in the arts into the laterals of monopoly. The general skill and judgment of the crafts belong to society as a whole, and invention is separable from the social stream only because it possesses a different specific gravity than the natural waters. [Citations omitted.]"

Moreover, Herzegh's simple substitution of butyl for natural rubber as a lin-

ing was not satisfactory. The butyl liner would not satisfactorily adhere to the other materials. A terrifically high percentage of failures led promptly to material departures from the product the plaintiff presumably thought was taught by the patent. By experimentation and a series of trials and errors, plaintiff has evolved a commercially practical and acceptable tubeless tire. Its evolution, in view of the prior art, and the adventitious availability of a new material, is commendable craftsmanship, but represents nothing more than what should have been obvious to a person having the ordinary skill of the art, and is lacking in novelty.

The Court finds as a fact, and concludes as a matter of law, that the element of the patent in Claims 11, 12, 13 and 19 relating to a liner of butyl type rubber composition is not patentable.

■ A fortiori, Claim 20 covering a "lining of substantially impervious material" is lacking in patentability. Whether or not a claim broad enough to cover any "substantially impervious material", past, present, or future, is vulnerable under the epochal Morse decision,[91] as an effort to patent an idea or concept, the idea was not new. In addition to the file wrapper references and Killen, McNeill and Eger, and Wingfoot,

Seddon[92] claimed that a tire made in accordance with his invention required no tube, "as the tire forms an air-tight tube." Duryea[93] claimed an airtight inner wall, and "an inner air-retaining lining." Neary[94] taught a liner around the inner surface of the tire and entirely around the rim-engaging surface of the base, to render the tire and rim "air-proof." Sankey[95] calls for "a cover having a liner rendered impervious to air under pressure." Duryea[96] discloses "a layer of rubber of sufficient thickness to retain the air." Parham[97] calls for "an impervious tire casing." Guagliardo[98] describes a casing "of a nature impervious to air." Linwood[99] called for a casing "of rubber and canvas or other suitable impervious resilient material" of conventional construction "and provided with a rubber lining integral therewith." Shoemaker[100] calls for an air tight rubber lining extending out onto the base of the bead portion.

The Court finds as a fact and concludes as a matter of law that the portion of Claim 20 calling for a "substantially impervious material", even if sufficiently definite, represents no advance over the prior art and is not patentable.

*The Sealing Ribs.*

Here again, in addition to the Patent Office citations, and Killen, McNeill and

91. O'Reilly v. Morse, 1853, 15 How. 62, 56 U.S. 62, 112–113, 117, 14 L.Ed. 601.

92. No. 774,790. Application November 24, 1903, patented November 15, 1904.
This, and the following eight patents, are part of plaintiff's exhibit of "Prior Art Generally—1903–1949." They are therefore not subject to the Fourth Circuit's criticism in Reynolds v. Whitin Mach. Works, 4 Cir., 1948, 167 F.2d 78, 83–84, cert. den. 334 U.S. 844, 68 S.Ct. 1513, 92 L.Ed. 1768, as to the significance of multiple citations by a *defendant*. However, a number of the patents contained in this exhibit were discussed by plaintiff's expert and the court assumed that the plaintiff offered the exhibit for some purpose, and has examined all 66 patents. A number have already been mentioned by the court under the heading: "Prior Art—Patents and Work on Tubeless Tires." Whatever "excursions

into the boneyard" (ibid. p. 84) have resulted, have at least been by invitation.

93. No. 776,650. Application January 16, 1904, patented December 6, 1904.

94. No. 779,730. Application May 28, 1904, patented January 10, 1905.

95. No. 803,510. Application January 24, 1905, patented October 31, 1905.

96. No. 875,053. Application April 8, 1907, patented December 31, 1907.

97. No. 1,163,258. Application February 28, 1914, patented December 7, 1915.

98. No. 1,379,915. Application May 21, 1920, patented May 31, 1921.

99. No. 1,608,703. Application November 4, 1925, patented November 30, 1926.

100. No. 2,186,178. Application February 11, 1937, patented January 9, 1940.

Eger, and Wingfoot, plaintiff's exhibit of prior art patents shows a full appreciation in the art of the need for an effective seal at the bead flange portion, and in some instances discloses the use of ribs for, or to assist in, accomplishing that end.

Duryea [101] called for a rubber liner with the rubber thicker, or slightly corrugated along the edge of the tire. " * * * These corrugations being of soft rubber flatten down under pressure and insure that any roughnesses or depressions in the metal [rim] are closed and make a more effective joint than if flat rubber alone is used." These ribs, although on the inner face of the beads, were used for sealing. Plaintiff's expert admitted that they had an outwardly convex, approximately semi-circular cross-section of substantially greater width than depth.

Neary [102] provided for lining the inner surface of the side flanges and the outer surface of the rim with a layer of soft rubber.

Clark [103] refers to flared channel bands, with flexible material, preferably rubber, to prevent water and dust entering the space between the bands and the casing.

Mack [104] extends flaps "preferably of some soft material, such as inner tube rubber," from a high pressure sealing casing, which pass beneath each bead, covering the bead base and the rim flange portions of a flat-bottom, straight-sided rim. Inflation pressure in the sealing casing will force the beads "very tightly radially inwardly and laterally outwardly against the edges" of the "strips * * * which being of soft rubber will be squeezed tightly against * * * the

flaps." No ribs or corrugations are shown or called for in the flaps. However, the use of soft rubber to seal the rim base and rim flange areas is clearly taught.

Shoemaker [105] teaches that when a tire with a cross-sectional shape in excess of a semi-circle is seated on a rim with inclined bead receiving portions, inflation will force the bead portions outwardly and up the inclines and will seat them so firmly "on the bead receiving portions * * * of the rim that they will form an air tight joint permitting the tire to be used without an inner tube."

Trautman [106] shows a modified clencher type disc rim. The heels of the tire are preferably roughened and so are the opposing surfaces of the rim, "whereby an airtight joint is assured at all times."

Conigrave [107] uses a "cavity" wheel. To effect a seal, "beadings" made of a more pliable material or nature than the main body of the "tyre" are provided, in which the beads are seated. The "beadings" extend from the outside, around the bead base, and up inside the tyre. "These beadings act as sealing, packing and wearing agents and may either be made integral with the tyre or be made grooved as shown and attachable thereto * * *."

Daddio [108] covers the entire flat-bottomed, straight-sided rim with a "highly elastic and pliable" filler member which is "interposed in the manner of a cushion between the rim and tire beadings." In substance, this is a separate chafer strip extending from the top of one rim flange, across the entire rim base, and up to the top of the other rim flange.

Shoemaker [109] calls for the convention-

101. No. 776,650. Application January 16, 1904; patented December 6, 1904.

102. No. 779,730. Application May 28, 1904; patented January 10, 1905.

103. No. 1,079,397. Application June 17, 1913; patented November 25, 1913.

104. No. 1,653,054. Application February 15, 1926; patented December 20, 1927.

105. No. 1,756,665. Application November 19, 1925; patented April 29, 1930.

106. No. 1,842,219. Application April 22, 1929; patented January 19, 1932.

107. No. 1,842,315. Application November 27, 1929; patented January 19, 1932.

108. No. 1,886,470. Application July 16, 1930; patented November 8, 1932.

109. No. 2,186,178. Application February 11, 1937; patented January 9, 1940.

al drop-center rim, on which is mounted a tire preferably provided with a "chafing strip" just outwardly of the outermost reinforcing ply "at the location where the bead portion of the tire engages the rim."

"The tire is completely lined with air tight rubber lining and this rubber extends around onto the base of the bead portions so that when said bead portions are crowded out and caused to bind tightly on the inclined portions 5' of the rim an air seal will be formed and no inner tube will be necessary."

This disclosure of the chafer strip "at the location where the bead portion of the tire engages the rim" is quite significant, particularly in the light of plaintiff's current production of tires.[110]

That Herzegh did not himself conceive of the sealing ribs of his patent as anything particularly unusual is clearly shown in his February 25, 1949 talk on "Puncture Sealing Tubeless Tires." After explaining that his air seal bead lock "did not find commercial acceptance"; that "commercial acceptance * * * obviously required a simple method of making an air tight mounting on existing standard rims"; and that "various means such as cements and gaskets were tried * * * but they proved too messy, uncertain and awkward", he characterized the solution as follows:

"The work finally lead (sic) to a form of sealing which *essentially is a gasket with multiple sealing ridges* molded integral with the tire bead." [111]

In this talk, in his final summary of "the distinctive features of a puncture sealing tubeless tire", his description of the seal is:

"2. A *slight bead shape modification* to provide a simple means of sealing the tire on a standard drop center rim."

Moreover, there is no adequate proof that sealing ribs of any kind are necessary to effectuate an adequate seal between the beads and the rim. In the cited prior art are many teachings of an adequate seal without ribs. More particularly:

(1) The McGay experiments showed that the sealing problem in tubeless tires could be solved by smooth beads on smooth rims.

(2) Plaintiff's counsel admitted that effective seals can be effected without ribs, but claimed that greater care in manufacture would then be required. However, plaintiff makes truck tires without sealing ribs.

(3) Firestone Tire & Rubber Company has supplied for taxicab use from 1951 to May 1956, 11,583 tubeless tires without ribs on the beads, which satisfactorily operated for a total of 499,297,361 miles, the average mileage per tire being 43,106.[112]

(4) New molds for defendant's conventional and tubeless tires are all being made without ribs.

The court finds as a fact, and concludes as a matter of law, that the element in Claims 11, 12, 13, 19 and 20 of the patent relating to the sealing ribs is not patentable.

Combination or Aggregation of Butyl Liner and Sealing Ribs.

Plaintiff contends that although each feature of the Herzegh patent was known

---

110. Also, the purpose, location and termination of the liner, except for the use of the (then unknown or not generally known) butyl type rubber are strikingly similar to Herzegh; or vice versa.

111. Note the absence of any reference to, or claim of novelty with respect to, the material of which the "ridges" were constructed, or their shape.

112. It is true that these tires have heavier construction and higher inflation than passenger car tires, and are primarily intended, and used, for relatively low speed driving in cities. However, such operation subjects the tires to substantially greater "curbing" than is true of the ordinary passenger car tire; and curbing is the most stringent test to which an air seal is subjected.

to the art, the specific placement and prescribed relationship of conventional tire, impervious liner, and sealing ribs constitute a patentable combination.

■ The care with which combination patents must be scrutinized, the improbability that invention will be found in an assembly of old elements, and the necessity that the old elements must not continue merely to perform their old individual functions, but must produce a whole that exceeds the sum of its parts, are forcefully stated in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, at pages 151–153, 71 S.Ct. 127, at page 130, 95 L.Ed. 162, where the court said:

"'The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention.' [Quoting with approval from Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 1938, 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008.] * * * The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable.

\* \* \* \* \* \*

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly."

In Hutchinson Mfg. Co. v. Mayrath, 10 Cir., 1951, 192 F.2d 110, 113, the court said:

"where a patentee brings together old elements in a mechanism, involving no new principle, to produce an old result, although he produces a machine that is more efficient and hence more useful in the art, it is still the product of mechanical skill and not of invention. Altoona Theatres v. Tri-Ergon Corp., 294 U.S. 477, 486, 55 S.Ct. 455, 79 L.Ed. 1005."

This principle was applied by the Court of Appeals for this Circuit in Kay Patents Corp. v. Martin Supply Co., Inc., 4 Cir., 1953, 202 F.2d 47, 50, affirming D.C. Md.1952, 105 F.Supp. 442; and Ingersoll-Rand Co. v. Black & Decker Manufacturing Co., 4 Cir., 1951, 192 F.2d 270, 274, affirming D.C.Md.1951, 94 F.Supp. 938, in each of which the court quoted with approval from the A. & P. case above; and in Goldman v. Polan, 4 Cir., 1938, 93 F.2d 797, 799.

As heretofore pointed out, the Patent Office Examiner had twice specifically rejected the argument that the butyl liner plus the bead seal represented a patentable invention. He took the position that the two operated independently of each other; either "could be used with a conventional form of the other and would function in the same manner and produce the same result when so used"; or, stated differently, "each element would perform no different function in the absence of the other."

At the trial Herzegh frankly testified that the seals to be effected by the liner and the ribs were entirely different, and answered two different problems. Specifically, he testified on re-cross examination:

"Diffusion has absolutely no relationship to the rim sealing device.

On the inside of the tire you have what we might call a chemical diffusion problem; that is, a matter of physical chemistry. On the rim-sealing device, the diffusion properties of the material used for the ribs is of no significance.

"We have there a problem of a mechanical seal. *The two seals are very, very different and should not be thought of in the same sense. There are two different problems; one is physical chemistry and the other is mechanical engineering.*"

Therefore, the liner functions as a liner without reference to whether or not the tire also has ribs, and regardless of the diffusion qualities of the material used in the ribs, if any; and the ribs, if any, regardless of the diffusion qualities of the material used function as ribs whether or not the tire has or has not a liner. Each element was used in the prior art for exactly the same purpose it was used by Herzegh; and the prior art disclosed a number of instances in which both were used together.[113]

As the two elements continue to perform their old individual functions,[114] the court holds that Claims 11, 12, 13, 19 and 20 of the Herzegh patent in this aspect are invalid under the principles laid down in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra, and the other authorities cited in this section of the opinion.

*Infringement.*

The court has followed the recommended "better practice", Sinclair & Carroll Co. v. Interchemical Corp., 1945, 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644; Blish, Mize & Silliman Hdwe. Co. v. Time Saver Tools, 10 Cir., 1956, 236 F.2d 913, of inquiring into the validity of the Herzegh patent before considering the defense of non-infringement.

Defendant began the manufacture of tubeless tires in November 1952, and first placed them on the market in February 1953. Defendant has produced tubeless tires of five different constructions, of which three have been discontinued, and two are currently being manufactured and sold. Plaintiff has selected Claim 19 and the two current production constructions as typical on the question of infringement, "because it believes that decision as to them will be determinative of the other claims and tires in suit." [115] It will therefore be necessary to consider in detail [116] only the two current constructions.

1. Production period February-March 1954 and August 1954 to date.[117]

The liner extends down between the ends of the outer two plies of the tire and the inner two plies of the tire and is intended to terminate approximately at the toes of the bead portions. However, because of manufacturing variations, the liner, in some instances, extends almost to the heel of the bead portion. The toe

113. What led the Patent Office Examiner finally to abandon his position that the liner and seal were an unpatentable aggregation is not disclosed. He may well have been influenced by the Herzegh affidavit, the misleading claims of commercial success, and the incomplete or incorrect description of the tires used in the A.A.A. tests. He of course did not have the benefit of Herzegh's admission, quoted above, that "diffusion has absolutely no relationship to the rim sealing device", and that the problems of the liner seal and rim seal "are very, very different and should not be thought of in the same sense."

114. Since the "function" of sealing at the bead flanges can be accomplished without ribs, there is all the more reason for holding that Herzegh's use of liner and ribs is not a patentable invention.

115. Plaintiff's brief after conclusion of testimony, p. 35, in the section entitled "Defendant Infringes". In view of the laudable candor and fairness of counsel throughout the case, and their well-known standing and ability, the court assumes that this limitation was advertently inserted. It will materially narrow the discussion of infringement by defendant's liner, particularly as to Claim 20.

116. Reference will be made to one particular feature of an earlier construction.

117. As heretofore stated, defendant's production tires for 1957 automobiles, and production for previous years on new molds, omit ribs.

strip of each bead extends around both the toe and the heel of the corresponding bead portion and up both the inner and outer sides of the bead portion. The toe strip of each bead laps the liner on the inner side of the corresponding bead portion and is lapped by the sidewall stock on the outer side of the bead portion. The circumferentially extending ribs are formed in the toe strips on the outer sides of the bead portions during molding. In some instances some of the sidewall stock flows down over one or more, usually not more than two, but occasionally all, of the ribs during vulcanization.

The toe strips are formed of a high grade natural rubber (smoked sheet) with a carbon black content of 40 parts per 100 parts of rubber hydrocarbon.

The black sidewall stock is a blend of natural rubber, reclaimed natural rubber and GR-S with a carbon black content of approximately 30 parts per 100 parts of rubber hydrocarbon. Within the limits of compounding, the toe strips, therefore, contain approximately 10 more parts of carbon black per 100 parts of rubber hydrocarbon than the black sidewall stock. White sidewall stock is of natural rubber and contains no carbon black.

Two compositions of liner stocks are used. The rubber components, in percentages based on rubber hydrocarbon content, are as follows:

| | | |
| --- | ---------------------- | ------ |
| (1) | Natural Rubber | 50% |
| | Pre-scorched Butyl (GR-I) | 12½% |
| | Butyl Reclaim | 37½% |

or

| | | |
| --- | -------------- | ----- |
| (2) | Natural Rubber | 25.8% |
| | GR-S | 38.7% |
| | Butyl Reclaim | 35.5% |

The term pre-scorched means that the Butyl has been modified with certain groups of chemicals under high temperature conditions resulting in a small amount of cross-linking or partial vulcanization of the Butyl. The pre-scorching is performed prior to the blending of the Butyl with the natural rubber and the Butyl reclaim.

2. Production period April 1953–February 1954 and September 1954 to date.[117a]

In tires of this construction, the liner laps the toe strips. It is intended that the liner terminate about ⅜ inch above the toes of the beads, but in some instances, because of manufacturing variations, the liner extends as far as the toe in production tires. The stocks used for the sidewalls, toe strips and current liner are the same as the stocks identified under the description of the construction for the period February–March 1954 and August 1954 to date. The rubber components of the stock used for the liner of tires produced from April 1953 to February 1954, given in percentages of rubber hydrocarbon content, are as follows:

| | |
| --------------------- | ---- |
| Natural Rubber | 50% |
| Pre-scorched Butyl (GR–I) | 50% |

Common Features.

Four or five circumferentially extending ribs are provided on the outer side of the bead portions of the tires. The ribs have rounded outer surfaces, an approximate height of ½₂ inch, and an approximate width at the base thereof of ³⁄₁₆ inch.

The liner in each case has a thickness of .040–.075 inch in the finished tire. It may be of either single or two ply construction. The air retention of the liner is essentially equivalent to that of the conventional butyl inner tube.[118]

117a. See footnote 117.

118. Bull, defendant's expert, testified that the blends or mixtures produced a liner stock not as impermeable as an all-butyl inner tube. Defendant has developed a high styrene GR–S with less permeability than ordinary GR–S or natural rubber, so that the air retention of the stock is about 75% that of the conventional butyl inner tube stock. The difference in gauges of an inflated butyl inner tube and the liner of the tubeless tire, results in the liner having air retention qualities equivalent to that of a butyl inner tube.

The sidewall stock is a blend of natural, reclaimed natural, and GR–S rubbers, except white sidewalls, which are of special white sidewall stock.

The toe strip stock is of natural rubber only.

### Alleged infringing elements.

#### 1. The sealing ribs.

There is and can be no question that the ribs on defendant's tires are located within the rib area of Claim 19, and that in "plurality", continuity, integral molding, and shape, defendant's ribs answer the descriptive language of Claim 19.

However, Claim 19 calls for ribs "of the same material as the side walls of said body." Admittedly, the ribs of defendant's tires are not of sidewall stock. Plaintiff counters by saying that "they are of the same general type material." But during the prosecution of its application in·the Patent Office, plaintiff chose deliberately to limit this claim to ribs of sidewall stock. It may not limit for purposes of validity, and enlarge for purposes of infringement. The rule of "file wrapper estoppel" is applicable. Exhibit Supply Co. v. Ace Patents Corp., 1942, 315 U.S. 126, 137, 62 S.Ct. 513, 86 L.Ed. 736; Smith v. Magic City Kennel Club, Inc., 1931, 282 U.S. 784, 789–790, 51 S.Ct. 291, 75 L.Ed. 707; Shepard v. Carrigan, 1886, 116 U.S. 593, 598, 6 S.Ct. 493, 29 L. Ed. 723; Jones v. Bodaness, 10 Cir., 1951, 189 F.2d 838, 841; see also Imperial Bottle Cap & Mach. Co. v. Crown Cork & Seal Co., 4 Cir., 1905, 139 F. 312, 323.

The court concludes that the ribs of defendant's tires do not infringe Claim 19. In this connection, it is not without significance that until October 1952, the sidewalls of plaintiff's tires were of natural rubber, and the ribs were formed in and of such sidewalls. In October 1952, synthetic rubber was used in sidewall construction. The sidewall stopped short of the heel of the bead. Plaintiff inserted a small chafer strip of natural rubber which either met or lapped the edge of the sidewall, and extended around the heel of the bead, terminating under the bead base. Ideally, three ribs were formed in the sidewall, and four in the chafer strip.

In March 1954, defendant, which has always made the sidewalls of its tubeless tires of a blend of natural, reclaimed natural, and GR–S rubbers, began the use of a natural rubber toe strip, which extends from above the rim flange down around the heel, across the base, around the toe and up the inner side, in which strip all the ribs are formed. In July 1954, on its puncture sealant tubeless tires, and in January 1955, on its non-puncture sealant tubeless tires, plaintiff began the use of a chafer strip coated on the inside with liner stock and on the outside with natural rubber stock, covering approximately the same area as defendant's March 1954 construction, except that a portion was tucked under the sidewall, three of the ribs being formed in the sidewall (of either natural or synthetic rubber) and four in the natural rubber portion of the chafer.

#### 2. The liner.

a. "Of substantially impervious butyl type rubber composition." (Claim 19.)

Neither plaintiff nor defendant contends that, insofar as this litigation is involved, the composition of defendant's tubeless tire differs from the conventional tire, except as to the sealing ribs and liner. The function of the liner in both plaintiff's and defendant's tires is the same; to prevent any harmful diffusion of air into the carcass. The litigation has at least implicitly assumed that defendant's liner adequately performs this function. If the factor—the liner—that accomplishes this end can properly be described as "substantially impervious", then obviously defendant's liner is "substantially impervious", and falls within that portion of Claim 19.

The fundamental question therefore is whether or not the liner used in defendant's tires is "of * * * butyl type rubber composition." In substance, plaintiff claims that these "liners are relatively impermeable because of their use of

butyl"; [119] and that "Butyl-type composition means * * * something that operates the way it does because of butyl." [120]

In the course of argument [121] plaintiff in effect took the position that any material used to decrease permeability, and containing *any* butyl, was a butyl type rubber composition. Defendant took the opposite pole, and contended that a butyl type rubber composition was one in which a type of butyl was the only rubber component; that whenever another rubber, such as natural rubber or GR–S, is used with butyl in a compound, the two rubbers are referred to as a "mixture" or "blend", and the compound or composition is referred to as a composition of the mixture or blend; and that when the term "compound" or "composition" is used, the name of one of the two rubbers is never used alone to characterize the composition. However awkward the phraseology may be, defendant contends that a product composed, e. g. of butyl and GR–S, should be referred to as "a composition made of a mixture of butyl and GR–S." This terminology was sustained by the testimony of defendant's expert Bull and by another expert [122] called for that sole purpose, who supported his own conclusion by reference to technical literature.

Plaintiff called no expert on this question,[123] and did not attempt to rebut it. Indeed, in the Sarbach application, filed June 18, 1949 (patent No. 2,676,636 issued April 27, 1954) plaintiff (through its patent attorneys) speaks of a " 'Butyl' composition" when the sole rubbery component is butyl; and refers to the blending of such butyl composition with other "rubbery compositions" (natural rubber,

GR–S, or natural rubber and GR–S) "to form a liner composition * * *." The resultant "liner element" is then claimed to be superior in several respects to "conventional 'Butyl' liners * *."

Defendant also urges that as Claim 19 calls for a liner "*of* butyl type rubber composition" this excludes other rubber-like compositions; defendant refers by contrast to Claim 2 that describes the puncture-sealing material as "comprising butyl type rubber"; and defendant cites Robie v. Carlton, 1948, 171 F.2d 310, 311, 36 C.C.P.A., Patents, 739, holding that "of" means consisting "entirely of the specified material", and that where the intention is to convey the idea that the article "contains the specified substance as one of its ingredients, the usual practice is to use such a word as 'including' or 'comprising' * * *."

On the basis of the expert testimony the court finds that the liner of defendant's tubeless tire, as it contains a substantial proportion of rubber other than butyl (50% of natural rubber in one case and 64.5% of natural rubber and GR–S in the other) is not made "of a * * * butyl type rubber composition" as called for in Claim 19.

■ However, apart from the conclusory aspect of the expert testimony, the court is of the opinion that as used in the Herzegh patent, and as understood by plaintiff prior to this litigation, the term "lining of substantially impervious butyl type rubber composition" meant a lining in which the only type of rubber was some type of butyl rubber.

(i) The only type of rubber mentioned in the specifications as "well suited for the purpose of this lining layer" [124] is

119. Plaintiff's Brief after conclusion of testimony, p. 38.

120. Tr. 1042, 1048.

121. Tr. 1042–1052.

122. Dr. Herman F. Mark, Professor of Chemistry at the Polytechnic Institute of Brooklyn and Director of the Polymer Research Institute.

123. Its expert, Billingsley, in comparing Claim 19 and the accused tires, was asked the following question and gave the following answer (Tr. 199):
"Q. Then the claim continues, 'of substantially impervious butyl type rubber composition'. Is that true of the U. S. Rubber liner? A. That is true of the U. S. butyl liner."
The foregoing is the sum of plaintiff's evidence on this aspect of infringement.

124. Col. 4, ls. 55–56.

"the butyl type of synthetic rubbers."[125]

(ii) In the only example of liner given in the patent, and which is described as having "given excellent results for the purposes of this invention in extensive tire tests",[126] the only rubber is butyl rubber.[127]

(iii) In the "Remarks" to the last amendments of the Herzegh application in the Patent Office, Herzegh's counsel attempts to make a great virtue of the fact that "the puncture sealing layer in the crown region * * * is adhesively compatible with the lining of butyl-type rubber composition". Now butyl rubber was known to be incompatible with natural rubber or GR–S; the puncture sealing layer described in the patent, and in general use by plaintiff for that purpose, had butyl rubber as the sole rubber component; therefore counsel was speaking of compatibility of butyl with butyl.

(iv) The liners of the tires first produced by plaintiff followed the patent in composition, and contained only butyl rubber.

(v) Herzegh, in his talk on "Puncture Sealing Tubeless Tire" in 1949, spoke of the diffusion problem having been solved by the invention of "Butyl rubber."

(vi) Plaintiff's Sarbach patent, previously discussed, used the term " 'Butyl' Composition" only where the sole rubber component was butyl.

(vii) In the summary of the "Tubeless Tire Patent Situation" made by plaintiff's house patent counsel on February 5, 1951, he described the Herzegh patent application as "claiming a tubeless tire with bead-sealing ridges, a butyl liner", and referred to the Goodyear (Wingfoot) 1943 application as showing a "butyl liner."

(viii) In the letter of March 9, 1951, of special patent counsel to plaintiff's house patent counsel on the "Tubeless Tire Situation", with reference to the prosecution of the Herzegh application, and the adverse citation of Lightbown by the Examiner, it is said:

"The essence of the Lightbown teaching is that the gum must contain both butyl rubber and natural rubber, *whereas the Herzegh liner contains no natural rubber whatever.*"

The court therefore finds as a fact that the liner used in defendant's tubeless tire is not a liner "of butyl type rubber composition" as that language is employed in Claim 19 of the Herzegh patent.

b. The surface covered by the liner.

The liner in the Herzegh patent covers 100% of the inner surface of the tire, being "preferably extended down to the bead portions, around the toe 26 of the bead portion and to the heel 27."[128]

Defendant's current construction tubeless tires (selected by plaintiff as "typical" on the point of infringement) have liners which cover 97% or 95% of the inner surface of the tires. This obviously is not a literal infringement. However, if defendant's departure were but "unimportant and insubstantial changes and substitutions" (Graver Tank & Mfg. Co. v. Linde Air Products Co., 1950, 339 U.S. 605, 607–608, 70 S.Ct. 854, 856, 94 L.Ed. 1097; City of Grafton v. Otis Elevator, 4 Cir., 1948, 166 F.2d 816, 821; Specialty Equipment & Mach. Corp. v. Zell Motor Car Co., 4 Cir., 1952, 193 F.2d 515, 518–9) the court of course would not hesitate to find infringement. But plaintiff's claim for 100% liner coverage of the inner surface of the tire was founded upon the recognition that if *any* portion of a cord was exposed to air under pressure, it would act as an air wick. Claim 19 therefore called for a lining "covering the inner surface" of the tire. Defendant has covered the remaining 3–5% of the inner surface with natural rubber instead of with the liner.

125. Col. 4, l. 53.
126. Col. 5, ls. 2–3.
127. Col. 5, ls. 5–11.
128. Col. 4, ls. 48–52.

Plaintiff counters by saying that where 97% [129] of the inner surface of the tire is covered solely with butyl material and the remaining 3% solely with natural rubber toe stock, the total diffusion rate for the entire inner surface would be the same as if the two rubbers were intermingled and the whole homogeneous mass used to line the entire inner surface of the tire. This was and is incomprehensible to the court. A roof with a surface of 100 square feet certainly does not afford the same defense to permeation by the elements, if it has three square feet completely uncovered [130] and the remaining ninety-seven square feet covered by slates one inch thick, that it would have if the entire area were covered by slates each 0.97 inches thick. A leaded window made for 100 panes of glass, each ¼ (0.25) inch thick, three of which are missing, certainly does not afford the same protection against the elements that would be provided if it had 100 panes each 0.2425 inches thick. A new pair of trousers from which moths have eaten three percent is not (regardless of the locale of the depredations) the same as a pair with an overall wear of three percent.

The court therefore finds as a fact that the extent and termination of the liner, called for by Claim 19, is not found in defendant's tires.

Plaintiff founds its alleged invention on the "combination" of liner and ribs; specifically, as described in Claim 19. For infringement, every element of the combination must be embodied in the alleged infringing device. Montgomery

Ward & Co., Inc. v. Rogers, 4 Cir., 1939, 100 F.2d 721, 722; I. T. S. Rubber Co. v. Essex Rubber Co., 1926, 272 U.S. 429, 444, 47 S.Ct. 136, 71 L.Ed. 335; Lektophone Corporation v. Rola Co., 1930, 282 U.S. 168, 171, 51 S.Ct. 93, 75 L.Ed. 274; Bailey v. Galion Iron Works & Mfg. Co., 4 Cir., 1936, 80 F.2d 805, 807; Walker on Patents (Deller's Ed.) sec. 461, p. 1697.

Therefore, the omission from defendant's tubeless tire of the sealing ribs, or specific liner, or specific extent and termination of the liner of Claim 19, would avoid infringement. A fortiori, the omission of all three, as found by the court, necessarily results in the conclusion of law that the accused device does not infringe Claim 19. As plaintiff has agreed that the decision of that claim is determinative of all the claims in suit, the court concludes as a matter of law that defendant does not infringe any or all of Claims 11, 12, 13, 19 and 20 of plaintiff's patent No. 2,587,470.

### Conclusion.

 Claims 11, 12, 13, 19 and 20 of patent No. 2,587,470 are invalid; but if valid, are not infringed by defendant; and the complaint must be dismissed.

The foregoing opinion embodies those findings of fact and conclusions of law deemed necessary by the court for the disposition of the case (F.R.C.P. rule 52, 28 U.S.C.). Counsel may, if they desire, submit requests for further, or more specific, findings.

An appropriate judgment will be entered upon submission.

129. This example, more favorable to plaintiff than the 95% application, is used to avoid repetition.

130. The analogy is not exact, since part of the inner surface of the tire is covered with something—natural rubber. But as the relative impermeability of natural rubber is the same as that of the sidewalls (or less, if the sidewalls are of defendant's improved GR–S), it is believed that the analogies are fair. The permeability of the cords is very much greater.